[No. B155411. Second Dist., Div. Seven. Oct. 21, 2002.]

CITY OF HOPE et al., Plaintiffs and Respondents, v.
BRYAN CAVE, L.L.P., et al., Defendants and Appellants.

CITY OF HOPE et al., Plaintiffs and Respondents, v.
WEIL, GOTSHAL & MANGES et al., Defendants and Appellants.

## COUNSEL

O'Melveny & Myers, James W. Colbert III and Paula E. Ambrosini for Defendants and Appellants Bryan Cave, L.L.P., and Lynn K. Thompson.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Mark G. Krum, Stephen Y. Ma; Arnold & Porter and Shauna Avrith for Defendants and Appellants Weil, Gotshal & Manges, Richard Ben-Veniste and Robert C. Odle, Jr.

Jones, Day, Reavis & Pogue, Alan E. Friedman and Gregory D. Schetina for Plaintiffs and Respondents City of Hope, City of Hope National Medical Center and Beckman Research Institute of City of Hope.

## OPINION

**MUNOZ, J.***—In this appeal we hold that that failure of appellants, the law firm of Bryan Cave, L.L.P., Lynn K. Thompson, a lawyer in that firm (collectively Bryan Cave), and the law firm of Weil, Gotshal & Manges,

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Richard Ben-Veniste and Robert C. Odle, Jr., lawyers in that firm (collectively WGM),[1] to prove they were third party beneficiaries of a contract containing an arbitration clause justified denial of a request to refer the matter to arbitration. Accordingly, we affirm the order of the trial court denying arbitration.

## FACTUAL BACKGROUND UNDERLYING THE PRESENT LAWSUIT[2]

Respondents City of Hope, City of Hope National Medical Center and Beckman Research Institute of City of Hope (collectively City of Hope) own and operate a biomedical research facility and a cancer treatment facility located in Duarte, California. In 1994 the then chief executive officer of City of Hope, Dr. Sanford Shapero, fired the then chief operating officer, Doe 3.[3] Shapero then promoted Mr. Andrew Leeka to replace Doe 3. Doe 3 responded by accusing Leeka and Shapero of sexual harassment. After an investigation by outside counsel, City of Hope settled the matter by paying money in exchange for a release and confidentiality agreement.

In March 1995, Doe 3's former administrative assistants, Doe 1 and Doe 2, were transferred out of City of Hope's administrative offices. They also retained Doe 3's attorney, who proceeded to file yet another accusation against City of Hope. Those matters were apparently resolved without extensive litigation.

During this time relations between City of Hope's board of directors (the Board) and Shapero and Leeka (hereafter sometimes Former Oficers) had deteriorated. In July 1995, Shapero arranged for Leeka's contract of employment to be renegotiated with a "golden parachute" for Leeka. On January 12, 1996, City of Hope and Shapero executed a settlement agreement and mutual release and Shapero formally resigned from City of Hope. As part of the settlement and mutual release, Shapero agreed not to disparage or disclose City of Hope confidences.

On April 8, 1996, less than 90 days after Shapero's departure, Leeka informed City of Hope he was resigning his position. Leeka further informed City of Hope that, since this was within 90 days of Shapero's departure, he

---

[1] Another defendant, The Fairfax Group Ltd., has also petitioned to have the matter referred to arbitration. Even though its petition was also denied, it has not appealed.

[2] Because the case presents a complicated factual pattern involving at least three law firms, it is necessary to have a detailed recitation of the facts.

[3] By a stipulation in the trial court, several of the people involved in the original events are referred to as Does 1, 2 and 3. This quest for secrecy and anonymity has reached almost paranoiac levels. The record before this court, consisting of over 130 exhibits and four bankers boxes, is mostly sealed.

was entitled to his "golden parachute"—a payment in excess of $1 million within 30 days. Negotiations ensued and on September 17, 1996, new agreements were signed between Shapero, Leeka and City of Hope. Among other benefits to Shapero were payments of $554,000 over a three-year period and a $1 million life insurance policy to be paid by City of Hope with Shapero's sister as the named beneficiary. Leeka's renegotiated agreement provided for him to receive in excess of $173,000.

The problems at City of Hope did not end with the departure of Shapero and Leeka. In November 1996, City of Hope was sued by Pat Nichols, Shapero's former executive secretary, who alleged she had been wrongfully terminated because she had been friendly with Shapero and Leeka and had spoken truthfully about wrongful activities on the part of the new City of Hope officers.[4] Thereafter, at least four more complaints were filed against City of Hope. Additionally, allegations were made against City of Hope by Shapero and Leeka. Also, one of Shapero's friends spoke to the Attorney General's Office, which commenced an inquiry about City of Hope.

### 1. *The WGM, Fairfax Group Lawsuit*

On July 17, 1998, City of Hope filed suit against the Fairfax Group, Ltd., Decision Strategies/Fairfax International, L.L.C., and Michael J. Hershman (collectively Fairfax)[5] and against WGM, alleging fraud, breach of contract, constructive fraud, and legal malpractice. Two months later, on September 14, 1998, a first amended complaint was filed against the same entities.

### A. *The Fairfax Allegations (Fraud, Constructive Fraud, Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Rescission and Restitution)*

City of Hope alleged that, in July 1995, Fairfax had been hired to act as an independent confidential monitor to investigate compliance with applicable laws and to develop internal policies relating to compliance. Unknown to the Board, Hershman had a prior relationship with Shapero and soon joined the Former Officers in their attempt to discredit the Board and also discredit City of Hope. The Former Officers' scheme to discredit included, among other things, using misleading facts to create distorted, incomplete stories about members of the Board and disseminating those stories to the local and

---

[4]City of Hope alleged in its complaint that this action was wrongfully brought and had been terminated by Nichols's dismissing of the action, an issuance of public apologies, the payment of City of Hope's costs and a continuing nondisparagement agreement.

[5]Decision Strategies was alleged to be the successor to the Fairfax Group. Hershman was alleged to be an attorney and a principal of Fairfax. It was later discovered Hershman was not an attorney. This factual discrepancy was corrected in the second amended complaint.

national media. Additionally, the Former Officers intended to provoke an investigation by the California Attorney General of groundless charges and instigate groundless lawsuits based upon those charges. Hershman was aware of the scheme and failed to disclose to the Board: (1) the prior relationship with Shapero; (2) that the Former Officers had a conflict of interest with City of Hope; and (3) that the true purpose of his agreeing to serve as a compliance monitor was to assist the Former Officers in their scheme to discredit City of Hope.

When tensions between the Former Officers and the Board intensified in late 1995 and the first part of 1996, Hershman and Fairfax continued to align themselves with the Former Officers and obtained confidential information from City of Hope that they passed on to Shapero and Leeka. Because of the duplicitous conduct of Fairfax, City of Hope allowed the Former Officers to enter into generous settlement agreements, which included substantial excess compensation. Had City of Hope known the true facts, it would have terminated the Former Officers.

City of Hope further alleged Fairfax's conduct continued even after the Former Officers' departure in early 1996. Fairfax, in its position as an independent monitor, continued to receive confidential information for City of Hope. This information was then passed on to the Former Officers. As part of the ongoing plan to discredit City of Hope, Fairfax prepared a report (Fairfax Report) concerning alleged wrongdoings of the Board that was based on twisted, misleading and distorted facts. As part of the vindictive efforts towards the Board, drafts of the Fairfax Report were distributed to the CBS television program "60 Minutes," the Los Angeles Times and the California Attorney General's Office. These actions had the effect of creating an expensive and time-consuming public relations problem for City of Hope. Additionally, based in part upon information obtained from Fairfax, the Nichols action had been wrongfully and maliciously filed in order to exact vengeance against City of Hope.

During the course of the Fairfax contract, City of Hope paid Fairfax in excess of $1 million in fees, even though Fairfax's conduct was, for the most part, aimed at harming its own client, City of Hope. City of Hope further alleged the plan to discredit City of Hope had finally been foiled. There had been two arbitrations with different judges between the Former Officers and City of Hope. In each arbitration, a respected former superior court judge of the Los Angeles Superior Court had found the two Former Officers engaged in a scheme of vengeance against City of Hope. As a result, money judgments and injunctions had been entered against the Former Officers prohibiting the Former Officers from disparaging City of Hope.

However, City of Hope further alleged, it was still uncompensated for the more than $1 million it had paid Fairfax for services it incurred while Fairfax was breaching its duties to City of Hope. City of Hope had also incurred substantial expenses defending against the baseless negative media campaign and groundless lawsuits. Finally, City of Hope had paid substantial excess compensation to the Former Officers because of, among other things, the Fairfax defendants' concealment of the scheme to disparage City of Hope. In the prayer, City of Hope requested rescission of the Fairfax contract, damages and punitive damages.

### B. *The WGM Allegations (Fraud, Legal Malpractice, Breach of Fiduciary Duty, Aiding and Abetting a Breach of Fiduciary Duty and Petition for Writ of Mandate)*

In that portion of the complaint directed at WGM, City of Hope alleged that it had hired WGM at the urging of Hershman, Fairfax's principal. WGM was engaged to provide counsel in connection with the evaluation of the Fairfax investigations that were to occur. City of Hope further alleged that, from the very beginning, WGM conferred with Hershman and the Former Officers about and assisted the Former Officers with their hidden agenda. In particular, Ben-Veniste, a WGM partner, received, from one of the Former Officers, a document which described the Board as the "enemies" and spoke of threatening litigation against City of Hope as a way for the Former Officers to gain some leverage in negotiating for their own self-interests.

WGM was also privy to documents revealing that the Fairfax defendants were not acting as independent neutral monitors of City of Hope but were instead helping the Former Officers in their actions against City of Hope. Ben-Veniste also reviewed documents from counsel for the Former Officers in connection with the Former Officers' ongoing battles with the Board. WGM had refused to, and is still refusing to give those documents to City of Hope. WGM never disclosed to City of Hope the apparent conflicts of interest between the Former Officers and City of Hope, nor did WGM ever disclose any information about the activities and intentions of the Former Officers. Instead, WGM advised and counseled the Former Officers in their war against City of Hope, while billing City of Hope for more than $160,000 in attorneys' fees.

City of Hope further alleged WGM had violated its ethical obligations by: (1) representing City of Hope while at the same time giving legal advice to the Former Officers; (2) failing to advise City of Hope of the conflicts between the Former Officers and City of Hope; (3) continuing to represent City of Hope without having disclosed the legal conflicts to City of Hope;

and (4) failing to disclose to anyone at City of Hope, other than the Former Officers, what it knew about the actions and intentions of the Former Officers, Fairfax and others acting in concert with them.

Against WGM, City of Hope requested general damages, punitive damages, and a writ of mandate directing WGM to allow City of Hope to copy all of its client files.

All defendants answered; and WGM filed a cross-complaint seeking unpaid attorneys' fees.

### 2. The Bryan Cave Complaint

Two and one-half months later, on November 30, 1998, City of Hope filed a separate complaint against Bryan Cave. The complaint alleged that, since 1992, Bryan Cave had been on a retainer to provide legal services to City of Hope. In 1995 when the sexual misconduct charges were made against the Former Officers, the Former Officers made plans for Leeka to get a new employment contract with City of Hope as a reward for his loyalty to Shapero. Neither of the Former Officers advised the Board or the outside counsel who usually drafted executive employment contracts of the new intended contract.

It was further alleged that in April or May of 1995, before the completion of the investigation of the sexual misconduct charges, Shapero approached Thompson at Bryan Cave and asked her to draft Leeka's new employment contract. Shapero stated he did not want to lose Leeka and a new contract would secure Leeka's loyalty. The new contract was intended to provide Leeka with, among other benefits, increased tenure and a "golden parachute" provision. Neither Thompson nor anyone else at Bryan Cave had previously been asked to draft an executive employment contract for a City of Hope employee; up until that time Thompson's primary duties for City of Hope had been in dealing with union matters.

Thompson was aware of the investigation on the sexual misconduct charges and that the jobs of the Former Officers might be in jeopardy. She was therefore aware, or should have been aware, that until the investigation was completed, it was not in the best interest of City of Hope to give Leeka a contract that would provide him extra tenure or a "golden parachute." Although Thompson advised Shapero to reevaluate the appropriateness of the request and recommended that Shapero wait, she did not inform the Board or City of Hope's counsel in charge of the Former Officers investigations.

About a month later, in June 1995, Thompson was again approached by Shapero, who once again asked her to draft a new contract for Leeka. At that time, Leeka's personal attorney expressed concern to Thompson about proceeding with the new contract in light of the pending charges against the Former Officers. Even though she knew the Former Officers' futures with City of Hope were uncertain, Thompson agreed and drafted a new employment contract for Leeka. Bryan Cave and Thompson billed City of Hope for their consultations with Shapero and Leeka, but once again Thompson failed to inform the Board or counsel that she had been asked to draft a new contract for Leeka.

In secretly drafting Leeka's new contract, Thompson added several provisions that were adverse to the best interests of City of Hope and were also a conflict of interest on her part since she had been retained by and was being paid by City of Hope. The provisions that were adverse to City of Hope's best interest included: (1) lengthening the term of the contract from two to five years; (2) eliminating a termination-for-cause provision so that Leeka could no longer be terminated for acts or omissions that damaged the reputation or standing of City of Hope; (3) adding a "change in control" (the golden parachute) provision which allowed Leeka to terminate his employment if Shapero left City of Hope; and (4) removing, as an entity to be notified should Leeka resign, the law firm which was representing City of Hope, but not the Former Officers, in the sexual misconduct action. The lengthening of Leeka's term from two to five years was unusual in that no executive other than Shapero, the CEO, was allowed to have a contract term longer than two years. The golden parachute, in addition to allowing Leeka to quit if Shapero left City of Hope, also allowed Leeka to accelerate all of the amounts due under the terms of the contract and collect as much as $1 million, even if Shapero was terminated for cause.

On July 7, 1995, before Leeka's contract had been finalized, Thompson met with the incoming chairman of the Board and counsel for City of Hope on the sexual misconduct claims. The subject of the meeting was the status of the claims against the Former Officers. Thompson was advised City of Hope was planning to hire an independent investigator who was going to report directly to the Board. When the chairman would not guarantee that the Former Officers would not suffer negative repercussions, Thompson began to personally attack him. At that point, Thompson had to be reminded that the City of Hope was her client, not the Former Officers. At the July meeting, Thompson did not inform either the Chairman or counsel that she was in the process of redrafting Leeka's employment contract with its golden parachute provision.

Within a day or two of the July 7 meeting, Thompson telephoned Shapero and expressed her concerns about her role in drafting the Leeka contract and

stated she had to cover herself. Shapero advised her to put her concerns in a letter to him. Four days later, on July 11, 1995, Thompson forwarded the final drafts of the Leeka contract to Shapero and Leeka. She also wrote the letter suggested by Shapero. She recommended disclosure to the Board and stated she was concerned because "I would consider the 'change in control' provision to be important for Sandy [Shapero] to disclose to the Board in the event there are any discussions about his departure before the expiration of his contract. Otherwise, this provision could result in substantial economic consequences which are unforeseen by the institution at the time such decisions are made."

Once again Thompson did not inform the Board or any counsel of the secret contract and specifically did not forward any copies of the agreement to any counsel or the Board. On July 19, 1995, Leeka signed his contract and Shapero signed on behalf of City of Hope. At the time of the signings, both Former Officers knew their jobs were in jeopardy and Thompson knew or should have known that unless Shapero obtained the Board's approval, Shapero's conduct was ultra vires.

Later that year, around October 1995, Thompson drafted two other secret agreements for employees that Shapero signed for City of Hope without obtaining Board approval. Neither Thompson nor Shapero notified the Board or its counsel about the additional contracts. Had City of Hope known about the secret agreements, it would have fired the Former Officers. Instead, and because Thompson had not informed the Board or counsel, Former Officers assembled information and documents that they later used in their attempts to harm the City of Hope.

In December 1995, Thompson knew the investigator had made his report and the Board had decided Shapero should leave City of Hope. Thompson also knew City of Hope and Shapero were negotiating Shapero's severance agreement. Although Thompson knew no relevant City of Hope fiduciary was aware of Leeka's $1 million golden parachute provision, she did not notify either the Board or counsel of its existence.

On January 12, 1996, Shapero entered into a settlement agreement with the Board. The settlement was an attempt to resolve all issues arising from the allegations of misconduct, as well as other disputes. Not knowing of Leeka's golden parachute and Shapero's role in its execution, City of Hope provided Shapero with a severance package that included a lump sum payment of $545,000 and monthly payments totaling another $545,000 for the remainder of Shapero's contract period. Additionally, there were other fringe benefits that totaled more than $1.25 million in value. Had City of

Hope known of the secret agreements, it would have terminated Shapero for cause.

Shortly after Shapero left City of Hope, Leeka called Thompson asking for an interpretation of his contract. Under the golden parachute provision, Leeka had 90 days within which to trigger the golden parachute and collect the entire cash sum due for his five-year term. Thompson did not report this inquiry to anyone at City of Hope nor did she advise anyone of the material terms of Leeka's contract.

About 87 days after Shapero's departure, and at a time when Leeka knew City of Hope's Chairman of the Board was out of the country, Leeka disclosed his golden parachute contract to another Board member. The Board took the position that the contract was ultra vires, beyond Shapero's authority and therefore City of Hope was not bound by its terms. On the 90th day following Shapero's departure, Leeka resigned and attempted to exercise the secret golden parachute clause for over $1 million.

Even after the Former Officers departed City of Hope, Thompson was included in their continuing actions against City of Hope's interests. When Leeka's former secretary, Pat Nichols, was terminated by City of Hope on June 25, 1996, Leeka called Thompson and sought her advice about Nichols's potential claims against City of Hope. Thompson, once again, failed to inform her client, City of Hope, of this contact.

On September 17, 1996, Leeka settled his claim against City of Hope for $173,000 in cash and insurance benefits. On that same day, Shapero and City of Hope entered into a supplemental agreement costing an additional $50,000. Had Thompson informed City of Hope about the secret employment contract, City of Hope would not have had to enter into these settlements.

City of Hope further alleged the Former Officers continued their attempts to harm City of Hope long after they had left. Using information and documents obtained while Thompson was concealing the secret agreement, the Former Officers caused City of Hope to expend substantial amounts of money to hire experts and professionals to assist in correcting the harm. Even though City of Hope has sued the Former Officers and obtained arbitration judgments against the Former Officers, City of Hope still remains uncompensated for millions of dollars in damages caused by Bryan Cave's actions. In addition to general, special, and incidental damages, City of Hope also sought punitive damages.

### 3. *The Proceedings Leading to This Appeal*

Between 1998 and 2001, the case was litigated as two separate lawsuits (BC194474 and BC201535). On June 21, 1999, the two cases were deemed related and assigned to the same judge.

On September 4, 2001, City of Hope filed a motion to consolidate the two cases and file amended complaints. Opposition to the motion was overruled; and, on October 15, 2001, the court granted City of Hope leave to file amended complaints. One week later, on October 22, 2001, Bryan Cave demurred to the complaint, filed a purported petition for arbitration, and requested a stay. Three weeks later, on November 14, 2001, the WGM defendants also filed a demurrer and a petition for arbitration and stay. Opposition was filed on the grounds that the moving defendants, by contesting the matters for three years, had waived whatever rights they had to compel arbitration.

Following a contested hearing, the court took the matter under submission. Four days later, on December 11, 2001, the court sustained the demurrers with leave to amend and denied the request for arbitration. This appeal followed.[6] (Code Civ. Proc., § 1294, subd. (a).)

### 4. *The Effect of the Amendments by City of Hope*

For more than three years the case was prosecuted under several theories of breach of fiduciary duty, legal malpractice and fraud. The initial complaints also contained allegations of aiding and abetting. Discovery was apparently conducted based upon that theory. After three years, City of Hope requested permission to file amended complaints to add an allegation of conspiracy and to modify some language in the operative pleadings. According to City of Hope, the proposed amendments corrected factual allegations based upon information disclosed in discovery and added the conspiracy claim. The conspiracy count, it was argued, was a direct outgrowth of the aiding and abetting allegations that had already been pleaded and was essentially an attempt by City of Hope to conform the pleadings to the state of the evidence as disclosed by discovery. When permission was granted and the amended complaints were filed, each contained identical language: "Each of the defendants committed acts in furtherance of this conspiracy, . . . In committing the foregoing acts, each of defendants [*sic*] *acted as the agent* of the other and all of the co-conspirators, including without limitation the Former Officers."

Once the amended complaints were filed, WGM and Bryan Cave claimed the agency allegations made them third party beneficiaries of the settlement

---

[6]The Fairfax defendants have not yet appealed.

agreements signed by the Former Officers in 1996. Those settlement agreements provided that any disputes under the agreements were to be submitted to arbitration. The settlement agreements also contained a provision releasing all parties *and their agents* from any and all acts that had occurred prior to the date of the signing of the agreements, September 17, 1996. Because the complaints now alleged that WGM and Bryan Cave had acted as agents of the Former Officers, WGM and Bryan Cave argued they were entitled to have the matters arbitrated pursuant to the settlement agreements. In a classic case of "chutzpah" and "Gotcha!" gamesmanship, Bryan Cave even demurred to the amended complaint, claiming that because the settlement agreements waived any misconduct of the Former Officers *or their agents* prior to 1996, the complaint should be dismissed against Bryan Cave even though Bryan Cave claims to have been representing City of Hope during this period of time.

It is the agency amendment and the release provisions that are central to this appeal. All sides have argued extensively about the effect of the agency allegations and specifically whether this language amounted to such a change in theory from the aiding and abetting allegations that WGM and Bryan Cave were entitled to demand arbitration once that allegation was made or whether WGM and Bryan Cave had waived their right to arbitrate by contesting the matter for three years. (See, e.g., *People v. McCoy* (2001) 25 Cal.4th 1111 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; *People v. Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184]; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *People v. Morante* (1999) 20 Cal.4th 403 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *People v. Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; *People v. Brigham* (1989) 216 Cal.App.3d 1039 [265 Cal.Rptr. 486]; *Groom v. Health Net* (2000) 82 Cal.App.4th 1189 [98 Cal.Rptr.2d 836]; *People v. Miles & Sons Trucking Service, Inc.* (1968) 257 Cal.App.2d 697 [65 Cal.Rptr. 465].) We need not resolve this issue because we find that WGM and Bryan Cave have not proved they were intended beneficiaries under the settlement agreements.

A PARTY SEEKING ARBITRATION AS A NONPARTY MUST PROVE IT IS AN INTENDED BENEFICIARY UNDER THE CONTRACT

1. *A Formal Petition Requesting Arbitration Is Required*

The problem in this case, as in many cases before the trial courts of this state, is that a request to compel arbitration requires the court to make a legal determination of the rights under a contract involving nonparties as well as the parties before it. Had a proper petition been filed, resolution of the issue would have been simpler.

■ First of all, "A petition to compel arbitration ' "is in essence a suit in equity to compel specific performance of a contract." ' (*Spear* v. *California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821]; *Freeman* v. *State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479 [121 Cal.Rptr. 477, 535 P.2d 341]; *Trubowitch* v. *Riverbank Canning Co.* (1947) 30 Cal.2d 335, 347 [182 P.2d 182].)" (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 411 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) Therefore, the rules covering complaints are applicable to petitions to arbitrate. These rules include Code of Civil Procedure section 425.10, subdivision (a), which requires that a complaint in a civil action contain " '[a] statement of the facts constituting the cause of action, in ordinary and concise language.' " (*Graphic Arts Internat. Union v. Oakland Nat. Engraving Co.* (1986) 185 Cal.App.3d 775, 781-782 [230 Cal.Rptr. 95].) In a case where the person asserting the demand is claiming as a third party beneficiary, a minimal requirement would appear to be an allegation of a controversy between the parties, facts demonstrating the existence of an arbitrable controversy, the existence of the written agreement, and an allegation that the other party has refused to arbitrate. (Code Civ. Proc., § 1281.2; *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215 [105 Cal.Rptr.2d 597].) The petition should also set forth the written agreement and the arbitration provision verbatim. (See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 496, pp. 925-926; but see *Condee v. Longwood, supra,* 88 Cal.App.4th 215.) Inclusion of the arbitration provision is necessary because, in addition to determining whether an arbitration agreement exists, the court needs to determine who has standing to demand arbitration. (*American Builder's Assn. v. Au-Yang* (1990) 226 Cal.App.3d 170, 178-179 [276 Cal.Rptr. 262]; *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524 [260 Cal.Rptr. 713].)

■ The petition to compel arbitration is heard in the same manner as any other motion. Factual issues are resolved by the trial court based on conflicting affidavits or declarations and, at the court's discretion, even oral testimony. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515].) "The determination of standing to arbitrate as a party to the contractual arbitration agreement is a question of law for the trial court in the first instance. (*Unimart* v. *Superior Court* (1969) 1 Cal.App.3d 1039, 1045-1047 [82 Cal.Rptr. 249].)" (*Valley Casework, Inc. v. Comfort Construction, Inc.* (1999) 76 Cal.App.4th 1013, 1017 [90 Cal.Rptr.2d 779, 100 A.L.R.5th 771].) Because WGM and Bryan Cave were claiming rights under the contract, it was their duty to demonstrate that the promises applied to them personally. (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 [87 Cal.Rptr.2d 856]; *Vahle v. Barwick* (2001) 93 Cal.App.4th 1323 [113 Cal.Rptr.2d 793].)

■ As explained in *Vahle v. Barwick, supra,* 93 Cal.App.4th 1323, in dealing with releases that are basically third party beneficiary contracts, "A release agreement containing boilerplate language that purports to excuse everyone in the world from liability can be enforced by persons who are not parties to the agreement. (*Lama v. Comcast Cablevision* (1993) 14 Cal.App.4th 59, 63 [17 Cal.Rptr.2d 224]; *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 439-440 [15 Cal.Rptr.2d 622].) But as explained in a thorough and well-reasoned opinion from Division Three of this court, *Neverkovec v. Fredericks*[, *supra*] 74 Cal.App.4th 337 . . . (*Neverkovec*), the burden is on the third party to prove the parties to the release agreement intended to benefit the third party.

"Release agreements are governed by the generally applicable law of contracts. (*Neverkovec, supra,* 74 Cal.App.4th at p. 348.) A third party's right to enforce covenants of a contract is predicated on the contracting parties' intent to benefit the third party. (*Ibid.*) It is not enough that a literal interpretation of the contract would result in a benefit to the third party. (*Ibid.*)" (*Vahle v. Barwick, supra,* 93 Cal.App.4th at p. 1328.)

### 2. The Informal Petition in This Case Improperly Tried to Shift the Burden of Proof

■ Here, given the allegations of the complaints, WGM and Bryan Cave could not, without substantial risk to their position, afford to have a hearing on the issue of whether, as agents of Shapero and Leeka, they were intended third party beneficiaries under the settlement agreements. While purportedly filing petitions for arbitration, each chose not to file formal petitions. Instead, they filed pleadings that relied upon an estoppel theory. Bryan Cave stated, "As the alleged agent of Shapero and Leeka, and hence, also an express third party beneficiary of the Settlement Agreements, Bryan Cave is entitled to enforce the arbitration agreements against COH [City of Hope]." WGM acted in a somewhat similar manner stating, "Now that City of Hope pleads that the Weil Gotshal Defendants 'acted as agents' of Shapero and Leeka in the course of the alleged misdeeds at issue in this action, the Weil Gotshal Defendants are entitled to enforce the mandatory arbitration provisions of the Settlement Agreements."

Estoppel may sometimes allow nonsignatories to a contract to demand arbitration. (See *Rogers v. Peinado* (2000) 85 Cal.App.4th 1, 9, fn. 6 [101 Cal.Rptr.2d 817].) However, as pointed out by the *Rogers* court, the linchpin of equitable estoppel is fairness. Here, there is no fairness principle upon which WGM and Bryan Cave can rely. Both Bryan Cave and WGM deny they were ever the agents of the Former Officers, just as they deny they ever

did anything wrong in their representations of City of Hope. Fairness in enforcing the arbitration agreement is of no aid or comfort to either Bryan Cave or WGM.

WGM and Bryan Cave tried to finesse their way into arbitration even though they had not shown they were third party beneficiaries under the contracts. Given the circumstances and atmosphere under which the settlement agreements were negotiated, this was probably an almost insurmountable task. (See *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46].) Since WGM and Bryan Cave did not prove they were intended beneficiaries under the settlement agreements, there was no error in denying their petitions for arbitration. (*Ibid.*)

### DISPOSITION

The order appealed is affirmed. City of Hope is entitled to costs on appeal.

Johnson, Acting P. J., and Perluss, J., concurred.

On November 13, 2002, the opinion was modified to read as printed above.