Filed 9/24/20  Yao v. Pro-Management Consulting CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| YU-JUNG YAO et al., | B293864 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC702426) |
| v. | |
| PRO-MANAGEMENT CONSULTING, | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

Law Offices of Paul P. Cheng & Associates, John P. Fitzmorris, Gene S. Lizaso, David T. Ching, Rebecca Gardner and Paul P. Cheng for Defendants and Appellants.

Yu-Jung Yao, in pro per., for Plaintiffs and Respondents.

Defendants and appellants Pro Management Consulting, Inc. (PMC) and John Tu appeal from the denial of their motion to compel arbitration of their dispute with plaintiffs and respondents Yu-Jung Yao, Yuh-Yuan Sun, and Wen-Jye Yao. They contend the trial court erred in concluding that the arbitration provision in the operating agreement for a related limited liability company was unenforceable because it was not signed. We find no error and affirm the trial court's order denying appellants' motion to compel.

**FACTUAL AND PROCEDURAL HISTORY**

We provide the following summary based on the limited record provided on appeal.[1]

*Complaint*

Respondents filed a complaint in April 2018 against appellants, as well as attorney Blair Greene and his law firm.[2] In the complaint, respondents alleged that Wen-Jye and Sun are a married couple residing in Taiwan with their sons Yu-Jung (an adult) and non-party Yu-Hao (a minor). In 2014, they became

---

[1]The appellate record contains both a clerk's transcript (requested by appellants) and an appellants' appendix (submitted by appellants). It is unclear why appellants included both. The clerk's transcript contains appellants' motion to compel arbitration, respondents' opposition, and appellants' reply thereto, along with accompanying exhibits. The appellants' appendix contains the same documents plus additional documents, including two earlier versions of the operating agreement at issue here. To the extent it is not clear that documents included in the appellants' appendix were before the trial court in connection with the motion to compel, we will not consider them for the first time here.

[2]Greene and his law firm are not parties to this appeal.

interested in seeking permanent residency for their family in the United States.  They further alleged that appellant PMC was a California corporation "engaged in the business of providing immigration consultation services," and that Tu was the director and Chief Executive Officer of PMC.  In 2012, Tu and PMC formed Procal Investment and Management, LLC (Procal), a California limited liability company, "for the purpose of managing and operating restaurants serving as investment targets for foreign nationals applying for U.S. permanent residency through the Immigration Investment Program known as the EB-5 Program."  Tu is the managing member of Procal; together, Tu and PMC "control and manage Procal" and own 88.5 percent of the LLC.

Respondents further alleged that they were introduced to Tu in June of 2014.  Tu told them that PMC could "provide them with immigration consultation and application service [sic] that would enable them to obtain permanent residency by investing in the target project selected by PMC."  The target project was a Nancy's Pizza franchise restaurant, in which respondents would be the sole owners.  Tu advised respondents to submit two EB-5 applications along with a required $500,000 "investment" per application.

Based on the representations by Tu and PMC, respondents alleged that they entered into four separate agreements, copies of which they attached as exhibits to the complaint.  In July 2014, Wen-Jye and PMC entered into a consulting agreement (Wen-Jye consulting agreement), under which PMC agreed to provide "consulting services . . . relating to EB-5" in exchange for payment of $64,000.  In January 2015, Sun and PMC entered into an identical consulting agreement (Sun consulting

3

agreement) providing for another payment of $64,000.

Also in July 2014, Yu-Jung entered into an investment agreement (Yu-Jung investment agreement), pursuant to which he obtained a 0.25 percent interest in Procal in exchange for a $500,000 investment. Sun also entered into an identical investment agreement (Sun investment agreement) providing for a 0.25 percent interest in Procal in exchange for an investment of $500,000. As a result, respondents alleged that Yu-Jung and Sun were members of Procal, each holding a 0.25 percent interest in the company.

The complaint alleged that defendants Greene and his law firm submitted respondents' EB-5 applications in March and April of 2015. Nancy's Pizza Alhambra opened in August 2015. In November 2015, Tu informed respondents that the restaurant "was not doing well" and was relocated to La Verne, California. Respondents alleged that they received no other information regarding the operation or status of the business, and were neither "informed nor consulted" regarding the decision to relocate the restaurant.

In 2016, respondents learned that the United States Citizenship and Immigration Services (USCIS) had rejected their EB-5 applications. When respondents asked Tu about it, he informed them that "the rejection was caused by Nancy's Pizza's failure to maintain 10 full time employees required by the EB-5 program." In January 2017, Tu told respondents that appellants would resubmit their applications, at an additional cost of $3,000.

In January 2017, Tu, "in his capacity as manager of Procal," sent a letter to respondents "requesting an additional capital contribution of up to $600,000 from each member. Tu claimed that Procal faced challenges 'due to the costs of our

4

projects exceeding initial projections and the rising labor costs in California,'" and stated that the additional funds were needed to maintain Procal's operations. Respondents alleged that they did not make the additional contributions, as they had "grown suspicious of Tu's management and operation of Procal." In February 2017, Tu informed respondents that Procal could not maintain the number of employees required by the EB-5 program for both applications. Accordingly, Yu-Jung withdrew his EB-5 application so his investment could be combined with the Sun application. The revised Sun application was submitted to the USCIS by appellants in February 2017.

Respondents alleged that from August to December, 2017, Tu contacted them several times threatening to close Nancy's Pizza and to have Procal file for bankruptcy unless it received additional capital. Respondents received a notice of Procal's bankruptcy filing in March 2018. Respondents also alleged that the status of the revised Sun application was currently unknown.

Based on these facts, the complaint alleged nine causes of action. The first through fourth causes of action were brought by Yu-Jung and Sun against Tu and PMC, for breach of fiduciary duty, negligence, accounting, and breach of contract (Procal operating agreement), respectively. In support of these claims, Yu-Jung and Sun alleged that appellants were the majority and controlling members of Procal, while Yu-Jung and Sun were Procal's minority members. They claimed that appellants breached their fiduciary duties to them by mismanaging Procal and that appellants' mismanagement resulted in Procal's bankruptcy and the loss of respondents' investments. In their fourth cause of action for breach of contract, Yu-Jung and Sun alleged that "the business of Procal was governed by an operating

5

agreement by and among all of its members, as amended from time to time." This is the first reference in the complaint to the Procal operating agreement, accompanied by a copy attached as an exhibit.[3] Yu-Jung and Sun further alleged that appellants materially breached their duties under the Procal operating agreement by, among other things, failing to maintain the company's books and records, improper and unauthorized disposition of Procal's assets, and improperly causing Procal to file for bankruptcy without the knowledge and consent of its other members.

In the fifth cause of action Wen-Jye and Sun alleged another breach of contract claim against Tu and PMC for breach of the consulting agreements. The complaint alleged that appellants mismanaged their EB-5 applications and "investment projects." Respondents brought the sixth cause of action for fraud in the inducement and seventh cause of action for unfair business practices against Tu and PMC, based on Tu's fraudulent representations that respondents could obtain permanent residency status if they hired him and PMC and invested in Procal. In the eighth cause of action by all respondents against all defendants for professional negligence, the complaint alleged that respondents "relied on Defendants' knowledge and expertise" in "the EB-5 application process and the operation of franchise restaurants," but that defendants acted negligently in providing

---

[3]The "Amended and Restated Operating Agreement" for Procal attached to the complaint, as well as appellants' motion to compel arbitration, lists an effective date of January 1, 2017. We do not consider two earlier versions of the operating agreement included in the Appellants' Appendix, as there is no indication these were before the trial court.

6

their "professional consultation services" to respondents. Finally, the ninth cause of action by all respondents alleged legal malpractice against Greene and his law firm, related to the effort to obtain permanent resident status for respondents.

***Procal operating agreement***

The Procal operating agreement states that it is effective as of January 1, 2017, "by and between the persons and entities identified as Members on Schedule 1 attached hereto" and those who later become members by executing a joinder. The purpose of the agreement is to "provide for the management of the business and the affairs of the Company, the allocation of profits and losses, the distribution of cash of the Company among the Members, the rights, obligations and interests of the Members to each other and to the Company, and certain other matters." Article 13 of the agreement contains a dispute resolution provision, which provides for alternative dispute resolution procedures, including mediation and then arbitration, as the "sole and exclusive" procedure for resolving "any dispute arising out of or relating to this Agreement." The agreement contains two pages on which bracketed language suggests signature pages will be attached, but does not include any signature pages. In the attached Schedule I, Tu is listed an initial member and Yu-Jung and Sun are listed as "investing members."

***Investment agreements***

The Yao investment agreement between Yu-Jung and Procal, lists an effective date of July 3, 2014. Pursuant to the agreement, Yu-Jung agreed to purchase a membership interest in Procal for $500,000, pursuant to the terms and conditions set forth therein. For its part, Procal agreed to "reasonably cooperate with and assist" Yu-Jung with the application for

lawful permanent resident status, including "us[ing] reasonably commercial efforts to expand its business and hire at least 10 additional employees as quickly as is commercially reasonable." The agreement also provided that Procal would buy back Yu-Jung's interest once he obtained permanent resident status.

Additionally, the agreement contained a provision in which the parties agreed to "irrevocably submit[ ]" any action or proceeding "arising out of or related to this agreement or any other instrument, document, or agreement executed or delivered in connection herewith and the transactions contemplated hereby . . . to the exclusive jurisdiction of any federal or state court sitting in the county of Los Angeles, California," and further agreed that "all claims in respect of the action or proceeding may be heard and determined in any such court." The agreement was signed by both parties. The Sun investment agreement, dated January 20, 2015, contained the same terms and was signed by Sun and an officer for Procal.

### *Motion to compel arbitration*

Appellants moved to compel arbitration of the entire case in July 2018. They argued that the Procal operating agreement was the "umbrella agreement governing the parties' overall relationship," and therefore the court should enforce the arbitration provision in that agreement. They attached copies of the operating agreement, both consulting agreements, and both investment agreements as exhibits.

Respondents opposed the motion, arguing that the Procal operating agreement was not signed and was therefore unenforceable. Respondents also argued that several of the parties—plaintiff Wen-Jye and defendants Greene and his law firm—were not parties to the operating agreement. Thus,

respondents contended arbitration was improper under Code of Civil Procedure section 1281.2, subdivision (c),[4] as there was a possibility that a court and arbitrator could issue conflicting rulings.

In reply, appellants argued, as they do on appeal, that respondents were members of the LLC and therefore bound by the provisions of the operating agreement even if it was unsigned, citing Corporations Code section 17701.11, subdivision (b), which provides that "[a] person that becomes a member of a limited liability company is deemed to assent to the operating agreement." They did not address respondents' alternative argument regarding parties who were not Procal members.

The court held a hearing on the motion on October 4, 2018.[5] On November 8, 2018, the court issued an order denying the motion. After briefly outlining the arguments of the parties, the court ruled as follows: "Having read the motion, the memoranda and the declarations filed by the parties, and having heard argument of counsel, the Court finds that because the Bylaws[6] of Procal Investment and Management, LLC, were not signed, the arbitration agreement within will not be enforced." The court did not reach respondents' argument pursuant to section 1281.2, subdivision (c).

---

[4]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[5]There is no transcript of this hearing in the record and it does not appear that a court reporter was present.

[6]It appears that the court's reference to Procal's "Bylaws" was intended to reflect the Procal operating agreement, as that is the only document at issue containing an arbitration agreement.

9

Appellants timely appealed.  (§ 1294, subd. (a).)
Respondents have not filed a responding brief.

## DISCUSSION

Appellants contend the trial court erred in denying their motion to compel arbitration.  We conclude appellants have not met their burden to establish error.

Section 1281.2 authorizes petitions to compel arbitration, providing in part:  "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists."  Therefore, in considering a section 1281.2 petition to compel arbitration, a trial court must make the preliminary determination whether there is an agreement to arbitrate.  (See *Cruise v. Kroger Co.* (2015) 233 Cal.App.4th 390, 396 ["'[T]he threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate.'"]; *City of Hope v. Bryan Cave, L.L.P.* (2002) 102 Cal.App.4th 1356, 1369 ["[I]n addition to determining whether an arbitration agreement exists, the court needs to determine who has standing to demand arbitration."].)

"In California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.'" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)  "An essential element of any contract is the consent of the parties or mutual assent." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270.)  The "right to arbitration depends on a contract, and a party

10

can be compelled to submit a dispute to arbitration only if the party has agreed in writing to do so." (*Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 598; see also *Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1284.) "There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate." (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653.)

As the moving party, appellants have the burden of proving the existence of an agreement to arbitrate. (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890.) "Where the trial court's decision on arbitrability is based upon resolution of disputed facts, we review the decision for substantial evidence," but if no facts are in dispute, "we review the trial court's decision de novo." (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71-72.)

Here, appellants sought to compel arbitration based on the arbitration provision contained in the Procal operating agreement. They do not dispute that the agreement is unsigned. Instead, they rely on Corporations Code, section 17701.11, subdivision (b), which provides that "[a] person that becomes a member of a limited liability company is deemed to assent to the operating agreement." It is undisputed that Yu-Jung and Sun became members of Procal when they entered into the investment agreements; indeed, respondents alleged as much in the complaint. Consequently, appellants contend that respondents are bound by the operating agreement, including the arbitration provision, regardless of whether they signed it.

However, appellants have not shown that respondents' automatic assent to be bound by the general terms of the operating agreement, as related to the management of the entity

11

and the rights among its members, translates to specific consent to arbitrate their claims.

In other settings, courts have distinguished between a party's consent to an entire agreement and an arbitration provision within it, where circumstances indicated a lack of consent to the latter. For example, in *Romo v. Y–3 Holdings, Inc.* (2001) 87 Cal.App.4th 1153, 1157, the plaintiff signed an employee handbook that had an arbitration provision, but did not separately sign the arbitration section. The Court of Appeal concluded that the arbitration provision was properly read as a separate agreement and therefore not enforceable unless signed. (*Id.* at pp. 1159–1160; see also *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 91 ["read as a whole, the purchase agreement in this case contemplated that the arbitration of disputes provision would be effective only if both buyers and sellers assented to that provision. Since the sellers did not assent to this provision the parties did not agree to binding arbitration."].) Although not cited by appellants, we also note that Corporations Code section 17701.17, subdivision (b) expressly provides that a member may *consent in writing* to be subject to arbitration.

Under the circumstances present here, we are not persuaded that it was error for the trial court to conclude there was no mutual agreement to arbitration between the parties. The operating agreement is unsigned, although it contains pages suggesting that signatures were expected.[7] Moreover, the

---

[7]During oral argument, appellants' counsel cited to a document purporting to be an "Operating Agreement Joinder" signed by Yu-Jung. This document is contained in the appellants'

investment agreements that two of respondents actually signed do not incorporate the operating agreement or reference arbitration in any way. Indeed, the investment agreements contain an express provision requiring the parties to submit all claims to the jurisdiction of the court, in apparent conflict with a purported agreement to arbitrate. As such, we conclude appellants have not met their burden to establish the existence of a valid arbitration agreement.[8]

## DISPOSITION

The order denying appellants' motion to compel arbitration is affirmed. The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, ACTING P.J.                          CURREY, J.

---

appendix but not the clerk's transcript. Based on the record before us, there is no indication that this document was submitted to the trial court for consideration with the motion to compel arbitration. We therefore do not consider it for the first time on appeal.

[8]Because we affirm the denial of the motion to compel, we need not consider the alternate argument raised below that the case involved parties and/or claims not subject to arbitration and therefore that the court could have denied the motion under section 1281.2, subdivision (c).

13