**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| PATRICIA NORWOOD, an individual,<br><br>             Petitioner,<br><br>    v.<br><br>MULTICARE HEALTH SYSTEM, a<br>Washington State Non-Profit Corporation,<br>MULTICARE CONNECTED CARE, LLC, a<br>Washington State Limited Liability Company,<br>TACOMA ANESTHESIA ASSOCIATES,<br>INC., P.S., RAINIER ANESTHESIA<br>ASSOCIATES, P.C. and JOHN DOE 1-8,<br><br>             Respondents. | No. 57864-6-II<br><br><br><br>PUBLISHED OPINION |

MAXA, J. – Dr. Patricia Norwood appeals the trial court's order granting a motion to compel arbitration of her claims against Tacoma Anesthesia Associates (Tacoma), Rainier Anesthesia Associates (Rainier), MultiCare Health System, and MultiCare Connected Care, LLC (collectively, MultiCare). The motion to compel arbitration was based on an arbitration clause in Norwood's contract with LT Medical, LLC (LT), a company that contracts with health care professionals who travel to work at medical facilities on a temporary basis. Tacoma, Rainier, and MultiCare were not signatories to that contract.

Norwood is an anesthesiologist. She signed a "Services Agreement" with LT, agreeing to provide services to LT's clients as an independent contractor of LT. The Services Agreement included an arbitration provision that mandated arbitration in Atlanta, Georgia of "any controversy or claim arising out of or relating to the interpretation, enforcement or breach of" the agreement.

Norwood worked for a short time for both Tacoma and Rainier at MultiCare facilities. During her time at both facilities, Norwood alleged that she witnessed unsafe medical practices. She claims that after she reported these unsafe practices she was forced to resign from Tacoma and was terminated from Rainier. Norwood sued Tacoma, Rainier, and MultiCare, asserting claims of tortious interference with contractual relations, wrongful constructive discharge in violation of public policy, wrongful discharge in violation of public policy, and intentional infliction of emotional distress.

Tacoma, Rainier, and MultiCare moved to arbitrate Norwood's claims pursuant to the arbitration provision in her Services Agreement with LT. The trial court granted their motion to compel arbitration and ordered that the arbitration take place in Atlanta.

We hold that (1) the trial court did not err in ordering arbitration because equitable estoppel allows enforcement of the arbitration provision regarding Norwood's claims in that her claims are intertwined with the provisions of the Services Agreement, and (2) the trial court did not err in ordering arbitration in Atlanta because it is not clear that Georgia law will apply and therefore that arbitration in Atlanta will contravene Washington public policy.

Accordingly, we affirm the trial court's order granting the motion to compel arbitration of Norwood's claims in Atlanta.[1]

## FACTS

*Background*

Norwood is a practicing anesthesiologist. She travels to hospitals and medical care centers to work on a temporary basis.

---

[1] Because of our holding, we do not address the alternative arguments of Tacoma, Rainier, and MultiCare that they were third party beneficiaries of the Services Agreement and that the decision on applicability of the arbitration provision should be delegated to the arbitrator.

MultiCare operates several medical facilities in Washington. Tacoma and Rainier provide services at various facilities under contracts with MultiCare.

LT finds opportunities for health care professionals, working as independent contractors, to fill temporary needs at hospitals and other medical facilities around the country. An affiliate of LT is LocumTenens.com.

*LT Services Agreement*

In 2017, Norwood entered into a Services Agreement with LT. Under the Services Agreement, Norwood agreed to provide professional medical services to LT's clients or a client's assigned facility as an independent contractor of LT. LT agreed to offer Norwood's services to its clients, consistent with the Client Agreements with those clients. LT also agreed to pay Norwood for the services she provided to LT's clients. The agreement stated that Norwood at all times would be acting as LT's independent contractor and nothing in the agreement was intended to create an employer/employee relationship.

Under the Services Agreement, Norwood acknowledged that her medical staff appointment and privileges at an assigned facility may terminate upon "the termination of your service at an assigned facility by Client or [LT] for any other reason whatsoever, without recourse to any hearing and appeal procedure." Clerk's Papers (CP) at 8-9. Norwood also agreed to "release the Client, the assigned facility and [LT]  and [LT] affiliates from any claim or liability whatsoever . . . arising out of or related to any . . . termination, or loss of medical staff appointment." CP at 9.

The Services Agreement included an arbitration provision:

> *Any controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Services Agreement or the relationship between the parties hereto* shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules for the American Arbitration Association at any

arbitration hearing to be held in Atlanta, Georgia. If LT prevails, Contractor agrees to pay the cost of the arbitrator(s) and AAA fees and for reasonable expenses incurred by LT in connection with the arbitration, including attorneys' fees. This paragraph shall be specifically enforceable. The award rendered by the arbitrator(s) may be entered and enforced in any court of competent jurisdiction.

CP at 9 (emphasis added).

The Services Agreement stated that the laws of the state of Georgia would apply to "this Services Agreement." CP at 10.

*LT Client Agreements*

LocumTenes.com entered into a Client Agreement with Rainier in April 2011. LocumTenes.com entered into a Client Agreement with Tacoma in December 2017. The agreements related to LT's provision of temporary medical providers to Rainier and Tacoma. LT agreed to use its best efforts to present acceptable providers, and Rainier and Tacoma agreed to pay LT specified fees for the providers. Similar to the Services Agreement, the Client Agreements stated that providers were independent contractors. The Client Agreements also included an arbitration provision nearly identical to the arbitration provision included in the Services Agreement.

LT did not enter into any agreements with MultiCare. However, MultiCare entered into agreements with Tacoma and Rainier to provide medical services.

*Norwood Work at Tacoma and Rainier*

In March 2018, Norwood was assigned to work at Tacoma. Norwood alleged that while working for Tacoma at MultiCare hospitals, she observed on three occasions a patient fall off an operating room table. Norwood alleged that she reported the incidents to Tacoma, but no action was taken. Norwood alleged that she resigned from Tacoma in May 2019 because of safety issues that were not being addressed.

Norwood began work at Rainier in mid-2019. In June or July of 2019, Norwood alleged that she observed a patient fall off an operating room table at a MultiCare hospital. She alleged that she reported the incident to the patient's surgeons, but no follow-up took place.

In September 2019, Rainier terminated Norwood with cause. MultiCare requested that Norwood not be assigned to any MultiCare hospitals after a finding that there were discrepancies in her documentation of the use of controlled substances. Norwood alleged that the reasons that Rainier gave for her termination were pretextual.

*Trial Court Proceedings*

In April 2022, Norwood sued Tacoma, Rainier, and MultiCare. She alleged that all three were "employers" governed by Washington law. CP at 199. She asserted claims of tortious interference with contractual relations, wrongful constructive discharge in violation of public policy, wrongful discharge in violation of public policy, and intentional infliction of emotional distress.

In her complaint, Norwood alleged that she had a valid business expectancy because of her employment with Tacoma, Rainier, and MultiCare. She claimed that Tacoma, Rainier, and MultiCare acted in concert and intentionally interfered with her business expectancy. She asserted that as a result of their actions, she was forced to resign from Tacoma and was terminated from Rainier.

Norwood alleged that Tacoma and MultiCare disregarded her complaints related to patient safety, and that unnamed employees at Tacoma made her working conditions at Tacoma unbearable, forcing her to resign. This was the basis for her wrongful constructive discharge claim. Norwood alleged that Rainier and MultiCare discouraged her from disclosing risks to patient safety and that unnamed employees at Rainier or MultiCare wrongfully terminated her

5

employment at Rainier in order to silence her from speaking out. This was the basis for her wrongful discharge claim.

At some point in the litigation, Norwood moved to amend her complaint against Tacoma, Rainier, and MultiCare to add LT as a defendant. It was at that time that Tacoma, Rainier, and MultiCare learned about her Services Agreement with LT and the arbitration clause therein. Two days later, Norwood withdrew her motion for leave to amend.

On September 8, 2022, Norwood filed a complaint against LT and LocumTenens.com. Norwood alleged that LT and LocumTenens.com were "employers" subject to Washington law. The remainder of the complaint was almost identical to the earlier complaint against Tacoma, Rainier, and MultiCare. Norwood asserted the same claims against LT and LocumTenens.com as she did in her complaint against Tacoma, Rainier, and MultiCare: tortious interference with contractual relations, wrongful constructive discharge in violation of public policy, wrongful discharge in violation of public policy, and intentional infliction of emotional distress.

On September 15, Norwood moved to consolidate her lawsuit against LT and LocumTenens.com with her lawsuit against Tacoma, Rainier, and MultiCare. She argued that the actions involved common questions of law or fact that could be tried together. Specifically, she stated,

> The factual and legal questions in the MultiCare Case and the LocumTenens Case are virtually identical. . . . They arise from Plaintiff's complaints arising from the same medical procedures, and her resignation or termination from the same assignments. *Implicated in the case are Plaintiff's contractual relationship with the LocumTenens Defendants, the LocumTenens Defendants' contractual relationships with Tacoma Anesthesia and Rainier Anesthesia, and the contractual relationships between Tacoma Anesthesia and Rainier Anesthesia on the one hand, and the MultiCare Defendants on the other.* Plaintiff alleges that representatives of all Defendants in both actions played a role in the actions and decisions which constituted tortious misconduct against her.

CP at 232 (emphasis added).

Rainier filed an opposition to the motion to consolidate. MultiCare and Tacoma joined in the opposition. Rainier stated,

> Plaintiff's Motion to Consolidate presents another jurisdictional problem because LocumTenens and Plaintiff entered a binding, mandatory arbitration agreement with an exclusive venue provision in Atlanta, Georgia. Ordering consolidation here will prejudice LocumTenens, and any third party beneficiaries of the arbitration provision, since it will be unable to enforce the arbitration provision if it does not know it has been sued.

CP at 253. On September 30, the trial court denied Norwood's motion to consolidate.

On November 23, Rainier moved to compel arbitration. Tacoma and MultiCare joined Rainier's motion. They argued that equitable estoppel should apply to prevent Norwood from benefitting from the Services Agreement while also avoiding arbitration. In the alternative, they argued that Norwood intended to make them third-party beneficiaries of the Services Agreement. Neither Tacoma, Rainier, nor MultiCare argued that the Services Agreement delegated to the arbitrator the issue of arbitrability.

The trial court entered an order granting the motion to compel arbitration, and staying the litigation pending arbitration. The court ordered Norwood to file a demand for arbitration to be held in Atlanta. The court reserved "all issues of law and fact" for determination by the arbitrator.

In its oral ruling, the trial court stated that Norwood's claims arose out of and were intertwined with the Services Agreement:

> Really, but for that agreement, she would not be out here, would not have had any opportunity to be an independent contractor out here for providing any services to MultiCare, Rainier, or Tacoma. I am finding that the relationship between her and the clients, which are the defendants, are intertwined in that service agreement. And the client agreements with the LT Medical has many cross references throughout as to the clients.

Rep. of Proc. (RP) at 15-16.

7

Norwood appeals the trial court's order compelling arbitration of her claims in Atlanta.

ANALYSIS

A.    ENFORCEMENT OF ARBITRATION AGREEMENT

Norwood argues that the trial court erred by compelling her to arbitrate her claims against Tacoma, Rainier, and MultiCare.  We disagree.

1.    Legal Principles

Arbitration is a matter of contract.  *Burnett v. Pagliacci Pizza, Inc*., 196 Wn.2d 38, 46, 470 P.3d 486 (2020).  Therefore, the general rule is that "a party cannot be required to arbitrate a dispute he or she has not agreed to arbitrate."  *David Terry Invs., LLC-PRC v. Headwaters Development Group, LLC*, 13 Wn. App. 2d 159, 166, 463 P.3d 117 (2020).  Under this rule, nonsignatories to a contract generally are not bound by an arbitration clause in that contract.  *Townsend v. Quadrant Corp.*, 173 Wn.2d 451, 461, 268 P.3d 917 (2012).

One exception to this general rule is when equitable estoppel applies.  *Townsend*, 173 Wn.2d at 464.  Equitable estoppel prevents a party from claiming a contract's benefits while attempting to avoid the contract's burdens – such as an arbitration provision.  *Id.*

*Townsend* involved a signatory to a contract with an arbitration provision attempting to bind nonsignatories to the arbitration provision.  *Id.* at 460.  The situation here is different.  Nonsignatories to the LT Services Agreement – Tacoma, Rainier, and MultiCare – are attempting to enforce the arbitration provision in that agreement against a signatory – Norwood.[2]

---

[2] It could be argued that Norwood was subject to the arbitration provisions in the Client Agreements between LocumTenens.com and Tacoma and Rainier, even though she was a nonsignatory to those agreements.  But Tacoma, Rainier, and MultiCare do not make that argument, so we will not address it.

Division Three of this court addressed this scenario in *David Terry Investments*. 13 Wn. App. 2d at 171-72. The court stated,

> "[T]he equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants. . . . Courts applying equitable estoppel against a signatory have looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations."

*Id.* at 171 (internal quotation marks and citations omitted) (quoting *Metalclad Corp. v. Ventana Env't Org. P'ship*, 109 Cal. App. 4th 1705, 1713, 1 Cal. Rptr. 3d 328 (2003)). The court also cited several federal circuit court cases that "applied the doctrine of equitable estoppel to compel arbitration of a signatory's claims against a nonsignatory." *David Terry Invs.*, 13 Wn. App. 2d at 171.

We review de novo a trial court's decision whether to compel arbitration. *Burnett*, 196 Wn.2d at 46. The party opposing arbitration has the burden of showing that the arbitration provision is not enforceable. *Id.* at 46-47. Washington's public policy strongly favors arbitration. *Id.* at 46.

2. Applicable Case Law

In *Townsend*, the Supreme Court addressed the arbitrability of tort claims arising from a contract. 173 Wn.2d at 454. The plaintiffs signed purchase agreements to buy houses from Quadrant, which contained arbitration provisions. *Id*. at 453-54. After they purchased the houses, the plaintiffs sued Quadrant for poor workmanship that resulted in defects that caused personal injuries from mold, pests, and poisonous gases. *Id*. at 454. They also argued that the arbitration provision could not be enforced against their children, who did not sign the purchase agreements. *Id.* at 455.

A majority of the Supreme Court held that the children were not bound by the arbitration clause. *Id*. at 465 (Stephens, J., concurring/dissenting).[3] The majority reasoned that the children's claims were not grounded in the builder's duty to the children in contract. *Id*. Rather, the builder owed the children a duty as a building professional who owes a duty to individuals who foreseeably sustain personal injuries as a result of negligent acts. *Id*. In that circumstance, the court held that it did not make sense to force nonsignatories to arbitrate tort claims that did not arise out of the contract. *Id*.

As noted above, *Townsend* is not directly applicable here because the issue was whether an arbitration provision could bind nonsignatories, not whether nonsignatories could enforce an arbitration provision against a signatory.

In *David Terry Investments*, David Terry Investments (DTI), managed by David Terry, entered into joint venture agreements for the development of property with two entities managed by Steve Spady, including Headwaters Development Group (HDG). 13 Wn. App. 2d at 162. The joint venture agreements contained arbitration provisions. *Id.* at 163. Two other entities that Spady managed also were involved in the projects, but did not sign the agreements. *Id*.

Terry and DTI sued Spady and the various Spady entities, alleging that Spady sent DTI falsified documents related to the projects, inappropriately spent DTI funds, and transferred the project funds to himself. *Id*. at 163-65. Terry asserted claims of fraud, unjust enrichment, conversion, and breach of contract. *Id.* at 165. The Spady entities filed a motion to compel arbitration, which Terry and DTI opposed. *Id*. The trial court ordered only the breach of

---

[3] The lead opinion stated that the arbitration clause did apply to the plaintiffs' children. *Townsend*, 173 Wn.2d at 460-62. But Justice Stephens's concurrence/dissent was joined by four other justices, *id.* at 464, making her opinion the majority opinion on this issue.

contract claim to arbitration and retained jurisdiction of the noncontract claims against the Spady entities. *Id*. at 166.

On appeal, the court held that Terry was equitably estopped from avoiding arbitration even though he did not sign the joint venture agreements. *Id*. at 170. The court reasoned that Terry had invested his money in the projects through DTI, and he sought to enjoy the benefits of the contract (promises made in the agreements) while avoiding the burden (arbitration). *Id*.

The court also addressed the applicability of the arbitration provision to DTI's claims against Spady and his entities that did not sign the joint venture agreements. *Id*. at 171. As noted above, the court quoted *Metalclad*, 109 Cal. App. 4th at 1713, for the proposition that equitable estoppel applies when the claims against the nonsignatories to an arbitration provision are intertwined with the underlying contract obligations. *David Terry Invs.*, 13 Wn. App. 2d at 171.

Regarding the two Spady entities, the court noted that the claims against them were based on allegations that they received funds misappropriated by HDG. *Id*. at 172. And whether HDG misappropriated funds depended on the contract between DTI and HDG. *Id*. Therefore, the court concluded that DTI's claims against the Spady entities were "sufficiently intertwined with the joint venture agreements so as to require arbitration." *Id*.

Regarding Spady individually, the court stated,

> DTI's claims that Spady made false representations before and during the joint venture agreements are sufficiently intertwined with the joint venture agreements. Spady and HDG are substantially the same "person," and DTI's allegations against them involve the same asserted wrongs and issues – all intimately intertwined with the joint venture agreements. We conclude DTI's claims against Spady are such that equitable estoppel also requires those claims to be pursued in arbitration.

*Id*.

11

3.    Analysis

*Townsend* and *David Terry Investments* – and out-of-state cases cited by both parties – identify two types of equitable estoppel.  *Townsend* describes direct benefits estoppel, which focuses on whether the party opposing arbitration is claiming a contract's benefits while attempting to avoid the arbitration provision in the contract.  173 Wn.2d at 464.  *David Terry Investments* describes intertwined claims estoppel, where the claims asserted by the party opposing arbitration are intertwined with the underlying contract obligations.  13 Wn. App. 2d at 171.

a.    Language of Arbitration Provision

Initially, Norwood argues that the language of the arbitration provision in the Services Agreement limits application of the provision to her and LT.  We disagree.

The arbitration clause in Norwood's Services Agreement with LT states, "Any controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Services Agreement or the relationship between the parties hereto shall be resolved by binding arbitration."  CP at 9.  The plain meaning of this provision states that arbitration is required for a controversy or claim (1) arising out of or relating to the interpretation, enforcement, or breach of the Services Agreement or (2) arising out of or relating to the relationship of the parties.

Norwood argues that LT's clients are referenced throughout the Services Agreement, but not in the arbitration clause specifically.  Norwood emphasizes the portion of the arbitration provision stating that any controversies that arise relating to the relationship between the parties applies in this case.

While the second clause may limit arbitration to Norwood and LT, the first clause is quite broad.  A claim "arising out of" or "relating to" the interpretation, enforcement, or breach of the

Services Agreement does not necessarily involve only Norwood and LT. And the language here is different than in *Hogan v. SPAR Group, Inc.*, a case on which Norwood relies, where the arbitration clause at issue expressly limited its scope to disputes "between the parties" to the agreement. 914 F.3d 34, 37 (1st Cir. 2019). Therefore, Norwood's suggestion that LT's clients must be specifically named in the arbitration provision for that provision to apply to them is incorrect.

We conclude that the language of the arbitration clause does not preclude arbitration between Norwood and Tacoma, Rainier, and MultiCare.

b.   Intertwined Claims Estoppel

Tacoma, Rainier, and MultiCare argue that direct benefits estoppel applies here. We do not address this issue because we conclude that intertwined claims estoppel applies.

As noted above, intertwined claims estoppel applies when the claims are " 'intimately founded in and intertwined with' " the underlying agreement. *David Terry Invs.*, 13 Wn. App. 2d at 171 (quoting *Metalclad*, 109 Cal. App. 4th at 1713) (internal quotation marks omitted).

Norwood argues that her claims are not intimately connected with the Services Agreement, the claims are not based on the Services Agreement, and she did not allege a breach of that agreement. Instead, Norwood argues that she is asserting tort claims that are independent from the Services Agreement.

However, Norwood's claims involve the Services Agreement in at least five ways. First, Norwood's relationships with Tacoma, Rainier, and MultiCare cannot be understood without reference to the Services Agreement. There would be no relationships but for LT's assignment of Norwood to those medical providers. Norwood cannot present her claims without explaining the role of the Services Agreement.

Second, Norwood's interference with a contractual relationship claim arguably depends upon the existence of a contract. However, the only written contract to which Norwood was a party was the Services Agreement. Norwood may have an argument that she had a business expectancy apart from the Services Agreement that was interfered with. But Norwood cannot pursue this claim without explaining why she need not rely on the Services Agreement.

Third, Norwood's wrongful termination claims depend on her allegation that there was an employment relationship between her and Tacoma, Rainier, and MultiCare. However, a clause in the Services Agreement stated that Norwood would "at all times be acting and performing as an independent contractor of LT." CP at 7. Norwood may have an argument why this clause is inapplicable. But her claims cannot be presented without addressing the effect of this clause.

Fourth, Norwood claims that she was wrongfully terminated. But a clause in the Services Agreement stated that LT or a client could terminate Norwood's service at an assigned facility for "any other reason whatsoever." CP at 8-9. Norwood may have an argument why this clause is inapplicable. But her claims cannot be presented without addressing the effect of this clause.

Fifth, a clause in the Services Agreement stated that Norwood released "the Client, the assigned facility, and [LT] and [LT's] affiliates from any claim or liability whatsoever . . . arising out of or related to any . . . termination, or loss of medical staff appointment." CP at 9. Norwood may have an argument why this clause is inapplicable. But her claims cannot be presented without addressing the effect of this clause.

These examples show that the Services Agreement will be an integral part of any litigation of Norwood's claims. And Norwood even acknowledged this fact in her motion to consolidate, stating that "[i]mplicated in the case are Plaintiff's contractual relationship with the

14

LocumTenens Defendants." CP at 232. Therefore, we conclude that Norwood's claims are sufficiently intertwined with the Services Agreement to apply equitable estoppel in this case.

Accordingly, we hold that the trial court did not err in granting the motion to compel arbitration.

C.      FORUM OF ARBITRATION

Norwood argues that even if it is required to arbitrate its claims, the trial court erred by requiring the arbitration to take place in Atlanta, as provided in the arbitration provision. We disagree.

Washington courts presume that forum selection clauses are valid and enforceable. *Acharya v. Microsoft Corp.*, 189 Wn. App. 243, 254, 354 P.3d 908 (2015). An exception is when enforcement of the provision " 'would contravene a strong public policy of the State where the action is filed.' " *Id*. (quoting *Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 834, 161 P.3d 1016 (2007)). The party resisting enforcement of the forum selection clause bears the burden of demonstrating that it is unreasonable. *Acharya*, 189 Wn. App. at 254.

Courts generally apply the abuse of discretion standard when reviewing the validity of a forum selection clause. *Dix*, 160 Wn.2d at 833. However, de novo review applies to issues related to forum selection clauses if they present a pure question of law, "such as whether public policy precludes giving effect to a forum selection clause in particular circumstances." *Id*. at 833-34.

Norwood argues that the trial court erred by allowing Tacoma, Rainier, and MultiCare to enforce the forum selection clause because it would violate Washington public policy. She claims that Washington has a strong public policy encouraging reports of conduct that endangers the health and safety of patients and protecting the people that make such reports. But arbitration

in Georgia would thwart this public policy because she asserts that Georgia does not recognize a cause of action for wrongful termination in violation of public policy.

Norwood's arguments assume that Georgia law will apply her claims if the arbitration is held in Atlanta. But the trial court did not rule that Georgia law will apply to the arbitration. The court specifically reserved the question of "applicable law" for the arbitrator. CP at 660. The arbitrator will apply traditional choice of law rules to determine what law would apply.

The Services Agreement states that Georgia law will govern "this Services Agreement." CP at 10. But Norwood is not making a claim under the Services Agreement. She is asserting tort claims against Washington residents regarding her work in Washington. Therefore, we assume that the arbitrator will choose to apply Washington law to the arbitration proceedings and no Washington public policy will be violated.

We hold that the trial court did not err in ordering that the arbitration take place in Atlanta pursuant to the forum selection clause in the arbitration agreement.

CONCLUSION

We affirm the trial court's order granting the motion to compel arbitration of Norwood's claims in Atlanta.

MAXA, J.

We concur:

VELJACIC, A.C.J

GLASGOW, J

16