[No. G029970. Fourth Dist., Div. Three. June 30, 2003.]

METALCLAD CORPORATION, Plaintiff and Respondent, v.
VENTANA ENVIRONMENTAL ORGANIZATIONAL PARTNERSHIP
et al., Defendants and Appellants.

[black redacted blocks]

**COUNSEL**

Foley & Lardner and Kenneth S. Klein for Defendants and Appellants.

Julander, Brown & Bollard, William C. Bollard, Dirk O. Julander and Thomas J. Eastmond for Plaintiff and Respondent.

**OPINION**

**ARONSON, J.**—Ventana Environmental Organizational Partnership, L.P. (VEOP), North American Environmental Fund, L.P. (NAEF), and Ventana Global Limited, a holding company allegedly controlling both entities (collectively Ventana) appeal from an order denying their petition to compel arbitration. Ventana contends the trial court erred in refusing to compel Metalclad Corporation to arbitrate under a written contract with Ventana's subsidiary. Ventana is not a signatory to that document, but asserts the doctrine of equitable estoppel precludes Metalclad from raising Ventana's nonsignatory status to oppose arbitration. We agree and therefore reverse, with directions to grant the petition to compel arbitration and stay this litigation.

I

FACTS AND PROCEDURAL BACKGROUND

Metalclad is a publicly held corporation, with its principal place of business in Newport Beach, California. In 1994, Metalclad organized under

Mexican law a wholly owned subsidiary named Ecosistemas Nacionales, S.A. de C.V. (Econsa). Econsa functioned as a holding company for the waste disposal and treatment operations Metalclad planned throughout Mexico. As part of its acquisition of a Mexican industrial waste treatment concern, Metalclad hired Javier Guerra Cisneros as Econsa's director general. Cisneros was to oversee the development and operation of Metalclad's waste facilities, including procurement of the necessary government permits and licenses.

Metalclad hoped to construct and operate a waste disposal site in Aguascalientes, Mexico (the Project). By July 1998, Metalclad believed it had acquired, in the name of Econsa and its subsidiaries, all the permits and licenses needed for the Project. But according to Metalclad's complaint, Cisneros advised Metalclad that because of a prior, successful claim it made under NAFTA (North American Free Trade Agreement), certain "political forces" in Mexico wanted to halt the Project. Those forces, Cisneros intimated, would inevitably frustrate completion of the Project by Metalclad and its subsidiaries, favoring instead any Mexican-owned entity.

Believing it had no option but to sell Econsa, Metalclad, on Cisneros's suggestion, began meeting with Carlos Alberto de Rivas Oest (de Rivas), a Ventana representative. At the first meeting, held at a restaurant in Irvine, California, Metalclad and de Rivas discussed the sale of Econsa and its subsidiaries to Geologic de Mexico, S.A. de C.V. (Geologic), one of Ventana's portfolio companies. Through de Rivas, Ventana proposed Geologic would acquire 100 percent of Econsa's outstanding shares for $5 million, with a down payment of $125,000 and additional installment payments as the Project passed certain " 'development objectives' or construction phases." Due diligence by Ventana, shared with Metalclad, disclosed Geologic needed $5 million in working capital to meet the development objectives. According to Metalclad's complaint, de Rivas, "on behalf of Ventana, expressly represented and committed to [Metalclad] that Ventana would invest $5,000,000.00 in the Project so that it would have the necessary working capital to meet the agreed upon 'development objectives.' Ventana agreed that as these 'development objectives' were achieved, Metalclad would receive the balance of the purchase price, or $4,875,000.00. In reliance on these representations and financial commitments by Ventana, Metalclad entered into an oral agreement (the 'Agreement') with Ventana to sell the Project to one of Ventana's portfolio companies, Geologic."

Following this oral agreement, Metalclad entered into a written stock purchase agreement with Geologic for the sale of Econsa. The sale price was

the as-agreed amount of $125,000 up front and $4,875,000 to be paid as the development objectives were met. The written agreement included an arbitration clause: "Arbitration. *Any* controversy or claim *arising out of or relating to this contract* shall be settled by binding arbitration in accordance with the International Arbitration Rules of the American Arbitration Association. The arbitration shall be resolved by a panel of three independent arbitrators. The place of arbitration shall be Mexico City. The languages of the arbitration shall be English and Spanish. The substantive law shall be the laws of Mexico, excluding the conflicts of law rules." (Italics added.)

The written contract also contained a provision allowing Geologic to assign the contract within 90 days of closing. Metalclad understood the provision was included because Ventana "had yet to decide whether Econsa would be held by Geologic or by one of its other portfolio companies." According to Metalclad's complaint, de Rivas "assured Metalclad . . . that regardless of which company acquired and held Econsa, Ventana would honor its commitment to provide the $5,000,000.00 needed to develop the Project."

Cisneros conducted the contract negotiations on behalf of Metalclad. After the Metalclad-Geologic contract was signed in July 1999, Metalclad concluded Cisneros had conspired with de Rivas and Ventana to defraud it. In February 2000, more than 90 days after the written contract was executed, Geologic assigned its rights in Econsa, valued by Metalclad at more than $3 million in equipment alone, to a company named Promotora Industrial Galeana, S.A. de C.V. (Promotora) for "less than $50,000," according to Metalclad. Metalclad contends Promotora is a shell corporation set up by Cisneros with no assets other than the Econsa stock. According to Metalclad, Ventana has not met its obligation to invest $5 million working capital in the Project and Promotora is preventing completion of any Project development objectives (and hence payment to Metalclad) by selling off equipment needed to complete the Project.

In November 2000, Metalclad sued Ventana Global Limited, VEOP, NAEF, Geologic, Promotora, de Rivas, Cisneros, and numerous "Does" for breach of contract; fraud by affirmative misrepresentation; fraud by concealment; fraud by promise made without intention to perform; negligent misrepresentation; breach of fiduciary duty; conversion; unfair business practices; and express indemnity.

In January 2001, Metalclad filed an amended complaint, dropping Geologic and its assignee, Promotora, from the list of defendants. Soon thereafter, Promotora sought arbitration in Mexico pursuant to the arbitration clause

in the Metalclad-Geologic written agreement. Metalclad characterizes the scope of the American Arbitration Association arbitration in Mexico City as "sole[ly] . . . to obtain a determination of the validity of the transfer of Geologic's rights under the Metalclad-Geologic Agreement to Promotora." According to Metalclad, "the heart of [its] argument [in the arbitration] is that the transfer from Geologic to Promotora was accomplished by fraudulent collusion between Mr. [de Rivas] Oest and Metalclad's agent and fiduciary, Mr. Cisneros, who breached his fiduciary duty to Metalclad by arranging Econsa's transfer from Geologic to Promotora, a shell company owned by Mr. Cisneros."

Ventana filed three unsuccessful motions to stay this action pending the outcome of the arbitration. The third motion was denied with prejudice. Retaining a new attorney and pursuing another tack, Ventana petitioned to compel arbitration and dismiss the suit. The trial court denied the petition, but ruled that "all proceedings are stayed pending arbitration in Mexico." Ventana now appeals the denial of its petition to compel arbitration.

## II

### DISCUSSION

#### A. *General Arbitration Principles*

An immediate appeal lies from the denial of a petition to compel arbitration. (Code Civ. Proc., § 1294, subd. (a); *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 683 [99 Cal.Rptr.2d 809].) Arbitration is a matter of contract (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [115 S.Ct. 1920, 1924, 131 L.Ed.2d 985] (*First Options*); accord, *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 [222 Cal.Rptr. 1, 710 P.2d 833]) and, under the Federal Arbitration Act (FAA), agreements to arbitrate generally must be in writing. (9 U.S.C. § 2; accord, Code Civ. Proc., § 1281.2.) The parties dispute the applicability of the FAA.

#### B. *The Federal Arbitration Act*

The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements . . ."; it "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24, 25, fn. 32 [103 S.Ct. 927, 941, 942, 74 L.Ed.2d 765].) Doubts about whether an agreement to arbitrate applies to a particular dispute are to

be resolved in favor of sending the parties to arbitration. (*Id.* at p. 24 [103 S.Ct. at p. 941].) In light of the strong federal policy favoring arbitration, the parties' intentions in an arbitration contract "are generously construed as to issues of arbitrability." (*Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 626 [105 S.Ct. 3346, 3353-3354, 87 L.Ed.2d 444] (*Mitsubishi*).) Under the FAA, applying the doctrine of equitable estoppel as a matter of " 'federal substantive law of arbitrability' " (*Inter. Paper v. Schwabedissen Maschinen & Anlagen* (4th Cir. 2000) 206 F.3d 411, 417, fn. 4 (*Schwabedissen*)), federal precedent unanimously holds that, "[a]lthough arbitration is a contractual right that is generally predicated on an express decision to waive the right to trial in a judicial forum, . . . the lack of a written arbitration agreement is not an impediment to arbitration." (See, e.g., *Sunkist Soft Drinks v. Sunkist Growers* (11th Cir. 1993) 10 F.3d 753, 756-757 (*Sunkist*).)

The FAA applies here because the Metalclad-Geologic contract containing the arbitration clause involves transnational commerce. (9 U.S.C § 1 [scope of FAA includes arbitration under any contract involving " 'commerce among the several states or with foreign nations' "]; see *Mitsubishi, supra,* 473 U.S. at p. 631 [105 S.Ct. at p. 3356] [FAA's presumption in favor of arbitration "applies with special force in the field of international commerce"].)

Metalclad concedes federal law governs arbitration clauses related to international commerce, but argues "it must first be decided under state law whether there is a valid agreement to arbitrate between Ventana and Metalclad." True, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*First Options, supra,* 514 U.S. at p. 944 [115 S.Ct. at p. 1924].) And an agreement to arbitrate is only "valid, irrevocable, and enforceable . . . *as a matter of federal law*" (*Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9 [107 S.Ct. 2520, 2527, 96 L.Ed.2d 426]) absent " 'such grounds as exist at law or in equity for the revocation of *any* contract.' " (*Ibid.,* quoting 9 U.S.C. § 2.)

Here, neither the *formation* of the Metalclad-Geologic contract (or its arbitration clause), nor the *revocability* of either, is at issue. Given the breadth of the contract's arbitration provision, by its terms applicable to "[a]*ny* controversy or claim *arising out of or relating to this contract*" (italics added), the question is not so much *what* is covered by the agreement but rather *who* may invoke it. Whether Ventana, a nonsignatory to that agreement, may rely on it to compel Metalclad to arbitration is answered by federal law, not state law. (*Schwabedissen, supra,* 206 F.3d at p. 417, fn. 4

["Because the determination of whether International Paper, a nonsignatory, is bound by the Wood-Schwabedissen contract presents no state law question of contract formation or validity, we look to the 'federal substantive law of arbitrability' to resolve this question"].)

## C. *The Parties' Contentions*

Ventana seeks to invoke the arbitration clause in its subsidiary Geologic's written contract with Metalclad to acquire Econsa. Metalclad stands on its argument below that, while it had an oral agreement that Ventana would provide Geologic with working capital to complete the Econsa acquisition, "there is no written agreement between Ventana and Metalclad upon which to base an order to compel arbitration." Ventana contends Metalclad should be equitably estopped from raising Ventana's nonsignatory status to oppose arbitration.

## D. *Equitable Estoppel*

### 1. *Overview*

"Equitable estoppel precludes a party from asserting rights 'he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity." (*Schwabedissen, supra,* 206 F.3d at pp. 417-418.) In the arbitration context, a party who has *not* signed a contract containing an arbitration clause may nonetheless be compelled to arbitrate when he seeks enforcement of other provisions of the same contract that benefit him. (*Id.* at p. 418; *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 81 [100 Cal.Rptr.2d 683] (*NORCAL*).) As invoked by Ventana, the equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are " 'based on the same facts and are inherently inseparable' " from arbitrable claims against signatory defendants. (*Sunkist, supra,* 10 F.3d at p. 757, quoting *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.* (4th Cir. 1988) 863 F.2d 315, 320-321 (*J.J. Ryan*) ["When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement"].) Courts applying equitable estoppel against a signatory have "looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were ' " 'intimately founded in and intertwined with the underlying contract obligations.' " ' " (*Choctaw Generation Ltd. v. American Home Assur.* (2d Cir. 2001) 271 F.3d 403, 406 (*Choctaw*).)

In *Sunkist,* the court determined that a plaintiff who "ultimately must rely on the terms of [an] agreement in its claims against the [nonsignatory defendant]" should be "equitably estopped from repudiating the arbitration clause of the agreement." (*Sunkist, supra,* 10 F.3d at p. 757.) "The fundamental point," as explained by *NORCAL,* "is that respondent was not entitled to make use of the [contract containing an arbitration clause] as long as it worked to her advantage, then attempt to avoid its application in defining the forum in which her dispute . . . should be resolved." (*NORCAL, supra,* 84 Cal.App.4th at p. 84.) The doctrine thus prevents a party from playing fast and loose with its commitment to arbitrate, honoring it when advantageous and circumventing it to gain undue advantage. (Cf. *IDS Life Ins. Co. v. SunAmerica, Inc.* (7th Cir. 1996) 103 F.3d 524, 530 [where a party to an arbitration agreement attempts to avoid that agreement by suing a "related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration. Such a maneuver should not be allowed to succeed . . ."].)

### 2. *Equitable Estoppel's Wide Acceptance in the Federal Courts*

■ The federal circuits that have considered the doctrine of equitable estoppel have uniformly accepted it, in appropriate factual circumstances, as a basis for compelling signatories to a contract containing an arbitration clause to arbitrate their claims against nonsignatories. (*MS Dealer Service Corp. v. Franklin* (11th Cir. 1999) 177 F.3d 942 (*MS Dealer*); *Sunkist, supra,* 10 F.3d at pp. 756-757 [11th Cir.]; *McBro Planning and Develop. v. Triangle Elec. Const.* (11th Cir. 1984) 741 F.2d 342, 343; *Choctaw, supra,* 271 F.3d at p. 406 [2d Cir.]; *Grigson v. Creative Artists Agency* (5th Cir. 2000) 210 F.3d 524, 527 (*Grigson*); *J.J. Ryan, supra,* 863 F.2d at pp. 320-321 [4th Cir.]; *Hughes Masonry v. Greater Clark County Sch. Bldg.* (7th Cir. 1981) 659 F.2d 836, 838; see also 1 Domke on Commercial Arbitration (Wilner ed. 2001) § 10:07, pp. 18-19 [noting doctrine's wide adoption in federal courts].)

### 3. *An Issue of First Impression in California*

Neither the Ninth Circuit Court of Appeals nor any other California federal courts have addressed equitable estoppel's application under the FAA to questions of arbitrability. Even if they had, because the United States Supreme Court has not accepted or rejected the doctrine, we would remain free to reach our own conclusion, consistent with our obligation to interpret and apply federal law. ■ "On a federal question, the decisions of the United States Supreme Court are binding on state courts. However,

the decisions of the lower federal courts, while persuasive, are not binding on us. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) Thus, in the absence of a controlling United States Supreme Court opinion, we make an independent determination of federal law." (*Irwin* v. *City of Hemet* (1994) 22 Cal.App.4th 507, 520-521, fn. 8 [27 Cal.Rptr.2d 433].)

*NORCAL, supra,* 84 Cal.App.4th 64, employed equitable principles to bind a nonsignatory to arbitration, but California courts have recognized the doctrine compelling signatories to arbitrate with nonsignatories only in dicta. (*City of Hope* v. *Bryan Cave, L.L.P.* (2002) 102 Cal.App.4th 1356, 1370 [126 Cal.Rptr.2d 283] [noting "[e]stoppel may sometimes allow nonsignatories to a contract to demand arbitration," but doctrine deemed inapplicable in that case]; *Rogers* v. *Peinado* (2000) 85 Cal.App.4th 1, 9, fn. 6 [101 Cal.Rptr.2d 817] [citing federal cases for applying equitable estoppel against a signatory, but holding no basis existed there to "invoke the principles of equity"], disapproved on another ground in *Brennan* v. *Tremco Inc.* (2001) 25 Cal.4th 310, 317 [105 Cal.Rptr.2d 790, 20 P.3d 1086].) The issue is thus one of first impression in California. Before turning to equitable estoppel's application here, we first address the standard of review.

### 4. *The Standard of Review*

Because estoppel is equitable in nature, Metalclad contends the trial court's refusal to apply the doctrine to compel arbitration should be reviewed only for an abuse of discretion. At least one court, the Fifth Circuit Court of Appeals, has held this is the proper standard. (See *Grigson, supra,* 210 F.3d at p. 528.) *Grigson,* in turn, relied on *Hoefler* v. *Babbitt* (9th Cir. 1998) 139 F.3d 726, which enunciated the following general rule: "Because estoppel is an equitable concept that is invoked by the court in its discretion, we review the district court's rejection of appellants' equitable estoppel argument under the abuse of discretion standard." (*Id.* at p. 727.)

But as noted by the dissent in *Grigson,* courts reviewing the application of equitable estoppel in the arbitration context had, up to that point, uniformly applied the de novo standard when the facts were not in dispute. (*Grigson, supra,* 210 F.3d at pp. 539-540 (dis. opn. of Dennis, J.) [citing cases]; see also *MS Dealer, supra,* 177 F.3d at p. 946 ["We review this decision de novo"]; *Sunkist, supra,* 10 F.3d 753, 756 [same]; accord, *NORCAL, supra,* 84 Cal.App.4th at pp. 71-72.)

*NORCAL* is instructive on this point. There, the court required a nonsignatory to return to arbitration on equitable grounds, in part because she had

sought and benefited from legal defense provided under an insurance liability policy and could not therefore avoid the policy's arbitration clause. The case also turned on agency principles in that the nonsignatory had ratified her attorney's demand for arbitration. (*NORCAL, supra,* 84 Cal.App.4th at pp. 79, 81.) While equitable principles were a basis for the decision in *NORCAL,* the de novo standard still applied. The court reasoned that because the parties there did not dispute the facts but only their legal effect, the matter was a question of law. (*NORCAL, supra,* 84 Cal.App.4th at pp. 71-72.) Similarly, here, the parties do not dispute the facts but rather whether those facts constitute sufficient legal basis for equitable estoppel.

■ Metalclad correctly argues estoppel involves equitable considerations, but that is true of any petition to compel arbitration. (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 356 [72 Cal.Rptr.2d 598] [motion to compel arbitration "is simply a suit in equity seeking specific performance of a contract to arbitrate"].) Hence, "[w]here the trial court's decision on arbitrability is based upon resolution of disputed facts, we review the decision for substantial evidence," but if no facts are in dispute, "we review the trial court's decision de novo." (*NORCAL, supra,* 84 Cal.App.4th at pp. 71-72.)

Here, the parties presented no extrinsic evidence concerning the interpretation of the arbitration clause, nor was there conflicting evidence on the relationship among the various entities. The validity of an arbitration clause is a question of law " 'unless it turns upon the credibility of extrinsic evidence; accordingly, an appellate court is not bound by a trial court's construction of a contract based solely upon the terms of the instrument without the aid of evidence.' " (*Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1527 [60 Cal.Rptr.2d 138].) Because no conflicting evidence was presented on whether Metalclad should be bound by the arbitration agreement, we review the matter de novo.

### 5. *Equitable Estoppel's Application Here*

■ The 11th Circuit's decisions in *Sunkist* and *MS Dealer* persuade us equitable estoppel should be applied here. In *Sunkist,* the plaintiff (Sunkist) entered into a license agreement with Sunkist Soft Drinks (SSD) to produce and market an orange soda. The agreement contained a broad arbitration clause covering " '*any controversy or claim arising out of or relating to this Agreement or the breach thereof . . . .* ' " (*Sunkist, supra,* 10 F.3d at p. 755.) SSD was eventually acquired by Del Monte Corporation as a subsidiary, and Sunkist became dissatisfied with SSD's performance. After Del Monte and

SSD sought a judicial declaration that the controversy was subject to arbitration, Sunkist asserted tort and contract counterclaims arising from Del Monte's alleged interference with the Sunkist-SSD license agreement.

On appeal, the court reasoned: "Essentially, Sunkist contends that Del Monte, through its management and operation of SSD, caused SSD to violate various terms and provisions of the license agreement. Each claim asserted by Sunkist makes reference to the license agreement. Although Sunkist does not rely exclusively on the license agreement to support its claims, each claim presumes the existence of such an agreement. We find that each counterclaim maintained by Sunkist arises out of and relates directly to the license agreement. [¶] In addition, upon acquiring ownership of SSD, Del Monte ceased operating it as an independent enterprise and absorbed it into Del Monte's own internal soft drink division. For all practical purposes, SSD lost its independent operating status and became a part of Del Monte. The nexus between Sunkist's claims and the license agreement, as well as the integral relationship between SSD and Del Monte, leads us to the conclusion that the claims are 'intimately founded in and intertwined with' the license agreement. Therefore, we hold that Sunkist is equitably estopped from avoiding arbitration of its claims." (*Sunkist, supra,* 10 F.3d at p. 758.)

The nexus here between Metalclad's claims against Ventana and the underlying contract with Geologic, as well as the integral relationship between the Geologic and Ventana, persuades us equitable estoppel should apply. Just as the plaintiff in *Sunkist* claimed the parent caused its subsidiary to violate the underlying license agreement, Metalclad claims Ventana caused Geologic to breach the underlying contract for the acquisition of Econsa. Metalclad's breach of contract claim against Ventana could not be more "intimately founded in and intertwined with" the underlying Geologic contract. Metalclad knew Geologic's performance was dependent on Ventana investing sufficient working capital in its subsidiary to meet "development objectives" and pay Metalclad the balance due for Econsa. Indeed, Metalclad sought Ventana's assurances for that very reason, but only in an alleged oral contract without an arbitration clause. Metalclad agreed to arbitration in the underlying written contract but now, in effect, seeks the benefit of that contract in the form of damages from Ventana while avoiding its arbitration provision. Estoppel prevents this.

Metalclad's tort claims against Ventana are similarly "intimately founded in and intertwined with" the underlying Geologic contract. ▇ As stated in *Sunkist,* " '[I]t is well established that a party may not avoid broad

language in an arbitration clause by attempting to cast its complaint in tort rather than contract.' [Citation.]" (*Sunkist, supra,* 10 F.3d at p. 758.) The tort claims, moreover, only serve to demonstrate the integral relationship between Ventana and Geologic and that Metalclad's causes of action against each are "based on the same facts and are inherently inseparable." (*J.J. Ryan, supra,* 863 F.2d at pp. 320-321 [holding, as to conspiracy allegation: "When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement"].) Estoppel prevents Metalclad from avoiding arbitration by suing only the parent corporation in these circumstances. "Otherwise, 'the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.' [Citation.]" (*MS Dealer, supra,* 177 F.3d at p. 947.)

*MS Dealer* applied estoppel to prevent a plaintiff from pursuing litigation for claims of fraud and conspiracy in a new car purchase agreement. The agreement included an arbitration clause, as well as a service contract the plaintiff claimed was grossly excessive as a result of collusion between the dealer and the service contractor. The court compelled arbitration of the plaintiff's claims against the nonsignatory service contractor because "each of her fraud and conspiracy claims depends entirely upon her contractual obligation to pay $990.00 for the service contract." (*MS Dealer, supra,* 177 F.3d at p. 948.)

The court noted the plaintiff specifically alleged the nonsignatory service contractor "worked hand-in-hand with" the signatory new car dealer in a fraudulent scheme. (*MS Dealer, supra,* 177 F.3d at p. 948.) It was thus "clear that [plaintiff's] claims against [the dealer and the service contractor] 'are based on the same facts and are inherently inseparable.' " (*Ibid.*) The court concluded: "Her 'allegations of such pre-arranged, collusive behavior establish[] that [her] claims against [the nonsignatory service contractor are] intimately founded in and intertwined with the obligations imposed by the [purchase agreement].' [Citations.]" (*Ibid.*)

Similarly, Metalclad's allegations that Ventana and Geologic colluded to obtain Econsa by a fraudulent contract cannot help but be "intimately founded in and intertwined with" that contract, which Metalclad signed. Like the contract signatories in *MS Dealer* and *Sunkist,* Metalclad cannot avoid the arbitration obligation imposed by its underlying agreement with Geologic. "Another maxim of jurisprudence is relevant here," as stated in

NORCAL, " 'He who takes the benefit must bear the burden.' (Civ. Code, § 3521.)" (*NORCAL, supra,* 84 Cal.App.4th at p. 84.)

## III

### DISPOSITION

The order denying Ventana's motion to compel arbitration is reversed. The trial court is directed to continue to stay this litigation until resolution of the arbitration. (See Code Civ. Proc., § 1281.4.) Appellants are entitled to their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Bedsworth, Acting P. J., and Fybel, J., concurred.