# IN THE SUPREME COURT OF CALIFORNIA

FORD MOTOR WARRANTY CASES.

S279969

Second Appellate District, Division Eight
B312261

Los Angeles County Superior Court
JCCP No. 4856

July 3, 2025

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

FORD MOTOR WARRANTY CASES

S279969

Opinion of the Court by Corrigan, J.

Plaintiffs in these consolidated cases bought cars from various dealerships, signing sales contracts that included an arbitration provision. Alleging defects in the cars they purchased, plaintiffs sued. But they did not sue the dealerships. Instead they sued the manufacturer, Ford Motor Company (Ford), alleging Ford violated its own express and implied warranties and engaged in fraudulent concealment.

Ford claims it is entitled to compel arbitration by relying on an arbitration clause in the sales contracts between the buyers and seller dealerships. Although acknowledging that arbitration agreements are creatures of contract, and it was not a party to these sales contracts, Ford argues plaintiffs should be estopped from pursuing their remedies in court under an approach put forward in *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1717 (*Metalclad*) and its progeny. Under that analysis, in limited circumstances, if a plaintiff sues a third party to assert a claim that is " 'intimately founded in and intertwined with' " a contractual provision, that third party may move to compel arbitration of the claim even though that third party is a stranger to the contract. (*Id.* at p. 1717; see *id.* at pp. 1716–1719; see also *Yeh v. Superior Court* (2023) 95 Cal.App.5th 264, 270–272 (*Yeh*); *Kielar v. Superior Court* (2023) 94 Cal.App.5th 614, 619 (*Kielar*); *Montemayor v. Ford Motor Co.* (2023) 92 Cal.App.5th 958, 969 (*Montemayor*).)

1

We conclude this estoppel approach has no application here.  Ford seeks to invoke an arbitration clause in a dispute flowing, not from the contract where the arbitration clause appears, but from obligations imposed by statute or conventional fraud duties.  As plaintiffs' claims are not intimately founded in or intertwined with the sales contracts, plaintiffs should not be estopped from pursuing their remedies against Ford in court. The Court of Appeal's judgment is affirmed.

## I.  BACKGROUND

Between 2013 and 2014, plaintiffs purchased either a Ford Focus or Fiesta from various dealerships.  Each signed a form sales contract outlining the terms of the sale and related financing provisions.[1]  These contracts were between plaintiffs as buyers and the dealerships as sellers.  Ford, the manufacturer, was not a party to, or named in, the sales contracts.  The contracts referred to the purchaser as "Buyer" or "you" and to the dealer as "Seller-Creditor," "we," or "us." Although the sales contracts referred to the possibility that a buyer might enter into other service, warranty, and insurance contracts covering the vehicle, the sales contracts themselves neither contained nor incorporated terms of any other potential contracts.  In the sales contracts, the dealer expressly disclaimed any warranty.  However, the contract also clarified the dealers' warranty disclaimer, noting that it "does not affect

---

[1]    The essence of the contracts was that the dealers agreed to sell a car for a specified price and to finance the purchase as the contracts provided.  Buyers agreed to purchase the cars at that price and to comply with the financing terms.

any warranties covering the vehicle that the vehicle manufacturer may provide."

The sales contracts contained an arbitration provision. As recounted by the Court of Appeal below, it read, in part: " '**EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**' It later elaborates: '[a]ny claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claims or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase, or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who did not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.' " (*Ford Motor Warranty Cases* (2023) 89 Cal.App.5th 1324, 1330.)

After experiencing transmission problems with their cars, plaintiffs sued Ford. They alleged Ford marketed Fiesta and Focus models with defective transmissions that "reportedly could and did cause accidents and injuries" and that, knowing of these potential defects, Ford concealed them from the public. The complaints alleged Ford never disclosed the defects and publicly downplayed any danger. As a result, plaintiffs claimed they were induced to purchase their vehicles based, in part, on Ford's public statements and representations in their advertisements, brochures, and car window stickers.

All five plaintiffs asserted causes of action against Ford for violations of the Song-Beverly Consumer Warranty Act

(Civ. Code, § 1790 et seq.; Song-Beverly Act) with respect to express and implied manufacturer warranties, and four of the five also alleged fraudulent inducement based on Ford's concealment and misrepresentation of known safety defects of these vehicles. Two plaintiffs additionally claimed violations of the federal Magnuson-Moss Warranty — Federal Trade Commission Improvement Act (15 U.S.C. § 2301 et seq.). The trial court denied Ford's motion to compel arbitration, Ford appealed, and the Court of Appeal affirmed. (See *Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at pp. 1332–1343.) We granted Ford's petition for review.

## II. DISCUSSION

### A. *The Contractual Agreements*

Under the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.), a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." (9 U.S.C. § 2.)[2] Unless an exception applies, if the matter is arbitrable, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." (9 U.S.C. § 3.) "[I]n ruling on a motion to compel arbitration, the court must first determine whether the parties actually agreed to arbitrate the dispute. [Citations.] General principles of California contract law guide the court in making this determination." (*Mendez v.*

---

[2] As noted by the trial court below, the arbitration provisions here stated that "[a]ny arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration."

*Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.) "The party seeking arbitration bears the burden of proving the existence of an arbitration agreement," and "[w]here, as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236; see *Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 493.)

The FAA reflects a policy favoring arbitration, requiring that agreements to arbitrate be enforced in the same manner as any other contract. (See *Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 416–419.) We "look to California law to determine whether [Ford], as a nonsignatory to the sale contracts, may compel plaintiffs to arbitrate." (*Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at p. 1332; see *Arthur Anderson LLP v. Carlisle* (2009) 556 U.S. 624, 630–631.)

As noted, an arbitration clause appears in the sales contracts between plaintiffs and the respective dealers. There is no question here that Ford is not a party to those contracts, and plaintiffs did not expressly agree to arbitrate any dispute with Ford. The general rule is that one must be a party to an arbitration agreement either to be bound by or to invoke it. (See *Soltero v. Precise Distribution, Inc.* (2024) 102 Cal.App.5th 887, 892–893.) " ' "[T]here is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.) "Given that arbitration agreements are simply contracts, ' "[t]he first principle that underscores all of our arbitration decisions" is that "[a]rbitration is strictly a matter of consent." ' [Citations.] Arbitration is 'a way to resolve those disputes — but only those disputes — that the parties have

agreed to submit to arbitration.' [Citation.] Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?" (*Coinbase, Inc. v. Suski* (2024) 602 U.S. 143, 148.)

The answer to that first question here is simple: Plaintiffs and Ford have not agreed to *anything*, much less to arbitrate any dispute between them. Further, nothing in the agreement between plaintiffs and the seller dealers expressed an intent to empower third parties to invoke the arbitration clause. As noted, the agreement here allowed the contractual parties to arbitrate " '**ANY DISPUTE *BETWEEN US***' " (italics added), i.e., between plaintiffs and the dealers. (*Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at p. 1330.) Amici Chamber of Commerce of the United States and Alliance for Automotive Innovation contend the sales contracts here "express[] clear intent to cover any claim that 'arises out of or relates to' the 'purchase, or condition of this vehicle,' and explicitly encompass[] 'any resulting transaction or relationship (including any such relationship with third parties who did not sign this contract).' " The argument misreads the contract language and echoes a similar misreading employed in *Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486 (*Felisilda*). There, the plaintiffs purchased a car from a dealer and signed a preprinted sales contract with the same arbitration clause at issue here. (*Id.* at pp. 489–490.) After they sued the manufacturer for violation of the Song-Beverly Act, the manufacturer moved to compel arbitration under the sales contract, although it was not a party to that sales agreement. The trial court granted the motion, and the plaintiffs lost their claim in arbitration. *Felisilda* affirmed, pointing to the arbitration clause's reference to third parties and concluding

that "[b]ecause the Felisildas expressly agreed to arbitrate claims arising out of the condition of the vehicle — even against third party nonsignatories to the sales contract — they are estopped from refusing to arbitrate their claim against FCA." (*Felisilda*, at p. 497.)

The Court of Appeal below disagreed with *Felisilda*'s analysis, explaining:  "We do not read this . . . language as consent by the purchaser to arbitrate claims with third party nonsignatories.  Rather, we read it as a further delineation of the *subject matter* of claims the purchasers and dealers agreed to arbitrate.  They agreed to arbitrate disputes 'between' *themselves* — 'you and us' — arising out of or relating to 'relationship[s],' including 'relationship[s] with third parties who [did] not sign th[e] [sale] contract[s],' resulting from the 'purchase, or condition of th[e] vehicle, [or] th[e] [sale] contract.' "  (*Ford Motor Warranty Cases*, 89 Cal.App.5th at pp. 1334–1335.)

The lower court's reading here was correct.  The language of the provision is properly parsed as follows.  First we note that the provision begins and ends with references to the contract signatories.  It describes disputes between "you and us," and clarifies that "us" includes the dealers' employees, agents, successors or assigns.  There is no claim here that Ford is an employee, agent, successor, or assign of any of the dealers.  By its terms, the arbitration clause controls disputes (between "you and us") that arise out of the credit application, purchase, or condition of the vehicle, "this contract," or any *resulting* transaction or relationship with third parties."  (Italics added.)

Here, the suit is between plaintiffs and Ford.  It is based on allegations of Ford's improper inducement, concealment, and

fraud rather than disagreements with the dealers. The complaints alleged no contractual relationship between plaintiffs and Ford, certainly not such a relationship resulting from the sales contract.

The "third party" language in the arbitration clause means that if a buyer sues a dealer based on the condition of the vehicle, the *dealer* can elect to arbitrate that claim. The sales contract "says nothing of binding the purchaser to arbitrate with the universe of unnamed third parties." (*Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at p. 1335.) Other cases have reached similar conclusions. (See *Davis v. Nissan North America, Inc.* (2024) 100 Cal.App.5th 825, 843 (*Davis*); *Yeh*, *supra*, 95 Cal.App.5th at p. 278; *Kielar*, *supra*, 94 Cal.App.5th at p. 621; *Montemayor*, *supra*, 92 Cal.App.5th at p. 971.)

The Court of Appeal and cases in accord employ the more persuasive interpretation. While mentioning a dispute based on "a transaction or relationship with third parties," the provision as a whole makes clear that the parties to the contract are agreeing to arbitrate described disputes *between themselves*.

Ford attempts to invoke the arbitration agreement between the plaintiffs and dealers, relying on the nature of plaintiffs' claims in their lawsuits against Ford. As more fully described below, its argument generally goes as follows. Plaintiffs agreed to arbitrate any dispute with the dealer pertaining to the sales contracts. Although plaintiffs sued Ford and not the dealers, their claims are essentially an attempt to vindicate contractual terms. Accordingly, because plaintiffs seek to enforce terms beneficial to them, they should be bound by their own contractual obligation to arbitrate. Thus, plaintiffs

should be estopped from opposing arbitration and pursuing their claims in the courts.

The argument founders on its premise that plaintiffs are attempting to vindicate contractual terms. Plaintiffs' causes of action alleging warranty violations and fraud do not seek to enforce any contractual provision. As a result, they should not be estopped from pursuing their claims in court. To reach this conclusion, we first describe the origins of the position urged by nonsignatories to invoke arbitration agreements to which they were not parties.

## B. *Invocation of Arbitration Clauses by Nonsignatories*

The first appearance in California of this type of estoppel to permit the enforcement of an arbitration agreement by a nonsignatory appeared in *Metalclad, supra,* 109 Cal.App.4th 1705. The facts of *Metalclad* and the subsequent cases on which Ford relies are markedly different from the facts at issue here. Because those cases are so clearly distinguishable, we need not discuss them in all their intricate detail. For our purposes, it is sufficient to note that Metalclad agreed to sell its subsidiary, Esconsa, to Ventana's subsidiary, Geologic. The sales agreement, which included an arbitration clause, provided for a total purchase price of $5 million. Geologic was to make a $125,000 down payment with periodic installment payments due as the construction of an Esconsa plant progressed. According to Metalclad, the parties understood that Geologic would have to make substantial additional investments in Esconsa to meet the development objectives of an Esconsa plant project. Instead, Geologic never made the capital investments and sold Esconsa to a shell company for $50,000. The contractually required installment payments were never made.

Metalclad sued various entities, including Ventana, which sought to compel arbitration. In light of the complex corporate interrelationships and allegations relating to the disputed contract itself, the *Metalclad* court held that Ventana could invoke the arbitration clause even though it was not a party to the sales contract. It reasoned that, in its suit against Ventana, Metalclad was seeking to avoid the sales contract's arbitration clause while at the same time relying on other express payment agreements made by Geologic in connection with the acquisition. As a result, the court determined it was unfair to permit Metalclad to rely on contract terms helpful to them yet resist the arbitration provision. It concluded Metalclad's claims were " 'intimately founded in and intertwined with' " the underlying sales contract. (*Metalclad*, *supra*, 109 Cal.App.4th at p. 1717; see *id*. at pp. 1717–1719.) As a result, it applied a form of estoppel to bar Metalclad from avoiding arbitration as the sales contract provided. In doing so, it noted courts applying estoppel "against a signatory have 'looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " ' " (*Metalclad*, *supra*, 109 Cal.App.4th at p. 1713.) "Metalclad agreed to arbitration in the underlying written contract but now, in effect, seeks the benefit of that contract in the form of damages from Ventana while avoiding its arbitration provision. Estoppel prevents this." (*Id*. at p. 1717.)

Subsequent cases have applied the *Metalclad* approach, but they are likewise distinguishable. In *Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262 (*Boucher*), the plaintiff signed an employment contract with a company called Financial to become their senior vice president. The employment contract

contained an arbitration clause. Financial's assets were thereafter transferred to a different company, Alliance, which refused to hire Boucher as a vice president. Boucher sued, alleging Labor Code violations, and Alliance sought to compel arbitration. *Boucher* concluded the plaintiff should be estopped from pursuing his claims in court because those claims essentially sought to vindicate his rights under the employment contract. The court reasoned: "Under these circumstances, plaintiff's claims against defendant are intimately founded in and intertwined with the . . . employment agreement; therefore, he is equitably estopped from avoiding arbitration of his causes of action against defendant." (*Id.* at pp. 272–273; see also *Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 785–788 (*Garcia*).)

In *Turtle Ridge Media Group, Inc. v. Pacific Bell Directory* (2006) 140 Cal.App.4th 828 (*Turtle Ridge*), Turtle Ridge alleged it was a company that delivered printed advertising media and hoped to do business with the defendant, SBC, but had been rejected in the past because it was considered too small. When Turtle Ridge tried again, SBC expressed interest and suggested Turtle Ridge work together with another larger company, Clientlogic, which was bidding on a delivery contract. SBC ultimately awarded the contract to Clientlogic, and the contract included an arbitration clause. The SBC contract also expressly authorized Clientlogic to work with Turtle Ridge as its only "approved subcontractor." (*Id.* at p. 834.) Clientlogic and Turtle Ridge then entered a subcontract that incorporated the SBC/Clientlogic agreement. Turtle Ridge subsequently discovered fraud in the bidding process and encouraged Clientlogic to investigate. When Clientlogic inquired, SBC cancelled the Clientlogic contract, causing Clientlogic to end its subcontract with Turtle Ridge. Turtle Ridge sued SBC, which

invoked the arbitration clause in its contract with Clientlogic.[3] The trial court denied SBC's motion to compel, concluding Turtle Ridge was not a party to the SBC/Clientlogic contract that contained the arbitration clause. The appellate court reversed, relying on the *Metalclad* analysis: "The following emerges from our consideration of the contract and subcontract together: SBC and Clientlogic expressly agreed to arbitrate any disputes. Their agreement was expressly incorporated by reference in the subcontract between Turtle Rid[g]e and Clientlogic . . . . The result was that either expressly or by incorporation each agreement contained an arbitration provision. Given the contractual and actual relationships among the parties, Turtle Ridge's claims against SBC are legally intertwined with its subcontract with Clientlogic that contains the incorporated arbitration clause." (*Id.* at p. 834.)

Ultimately, *Metalclad*'s approach rests on a fairness rationale: If plaintiffs have agreed to arbitrate claims arising out of a contract dispute, they may not pursue a lawsuit to vindicate contractual provisions beneficial to them yet avoid an agreement to arbitrate, either by couching their claims as actions unrelated to the contract or by suing a nonsignatory.[4]

---

[3] Turtle Ridge's suit against Clientlogic was removed to federal court and was not before the Court of Appeal. (*Turtle Ridge, supra,* 140 Cal.App.4th at p. 832, fn. 4.)

[4] As an alternative argument, plaintiffs contend that *Metalclad*'s analysis runs afoul of *Morgan v. Sundance, Inc.,* *supra,* 596 U.S. 411. *Morgan* concluded that the FAA does not authorize federal courts to create arbitration-specific procedural rules favoring arbitration. (See *id.* at pp. 416–419.) Plaintiffs claim that a *Metalclad* application circumvents the general

### C. *Estoppel Inapplicable*

Ford's reliance on *Metalclad* is misplaced here. *Metalclad* and its progeny are remarkably different from the circumstances here in a variety of ways. Plaintiffs' causes of action against Ford do not depend on or invoke any of the terms of the sales agreements with the dealers, nor can they be construed to seek any benefit from those sales contracts. Further, the allegations and record here do not contain any of the complex corporate or layered contract relationships involved in the *Metalclad* line of cases.

Nevertheless, Ford seeks to suggest the suits are intertwined with the sales agreements. It urges that all its own warranties, whether express or implied, derive from the sale of goods, making them intertwined with the underlying sales contracts on that basis. It points to language in both the Song-Beverly Act and the California Uniform Commercial Code mentioning sales. (See, e.g., Civ. Code, §§ 1791.1, subd. (a)(1), 1791.2, subd. (a)(1); Cal. U. Com. Code, §§ 2313–2315.) The argument fails. Plaintiffs' warranty claims "arise from a statutory scheme separate and apart from the contracts." (*Yeh*, *supra*, 95 Cal.App.5th at p. 274.) Under the Song-Beverly Act, "[u]nless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."

California rule requiring detrimental reliance before a party may seek to rely on equitable estoppel. (See *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 585; *Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475–476.) In light of our resolution here, we need not, and do not, address plaintiffs' alternative argument.

(Civ. Code, § 1792.) Manufacturers may also make express warranties, which trigger various statutory provisions covering notice and repair or replacement of nonconforming goods. (See Civ. Code, § 1793 et seq.) Warranties must also "conform to the federal standards for disclosure of warranty terms and conditions set forth in the federal Magnuson-Moss Warranty-Federal Trade Commission Improvement Act . . . ." (Civ. Code, § 1793.1, subd. (a)(1); see 15 U.S.C. §§ 2304 [minimum standards for written warranties], 2308 [implied warranties].) These obligations are not terms of the sales contracts themselves but are imposed by statute.

Ford points to general language in prior opinions suggesting that warranties form a basis of the bargain underlying consumer goods sales. (See, e.g., *Gavaldon v. DaimlerChrysler Corp.* (2004) 32 Cal.4th 1246, 1258; *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 115–117.) Of course, a sales contract *may* contain express warranty provisions. But when a sales contract does not contain such provisions, nothing in these cases suggested that statutory warranty obligations automatically become actual terms of the sales contract itself. Indeed, the Song-Beverly Act expressly provides that implied warranties may be disclaimed by contract under certain circumstances (see, e.g., Civ. Code, § 1792.3). And, although a seller has the right to make an express warranty (see Civ. Code, § 1793), it need not do so. Express warranties may arise from sources outside a sales contract, including statements in a manufacturer's brochure (see *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 59–62; *Keith v. Buchanan* (1985) 173 Cal.App.3d 13, 22), and we have acknowledged that "the implied warranty of merchantability arises by operation of law." (*Hauter*, at p. 117.) The availability of a manufacturer's

14

warranty may influence a buyer's choice to purchase an item, but the existence of a warranty as a motivating factor for a purchase does not render the warranty part of the *sales contract* for purposes of applying the *Metalclad* approach here.

In these contracts, the dealers expressly disclaimed any assurance of warranty and made no representation as to warranties that "the manufacturer may provide."  Even though a buyer may receive a manufacturer's warranty because it bought a manufacturer's car from a dealer, "nothing in the California Uniform Commercial Code suggests that this automatically makes the manufacturer's warranty a part of the sale contract between the buyer and the dealership."  (*Davis*, *supra*, 100 Cal.App.5th at p. 841.)  As *Montemayor* reasoned, Ford's argument "conflates the concept of 'but for' causation with a determination whether the [plaintiffs'] claims are founded on obligations imposed on Ford under the sales contract."  (*Montemayor*, *supra*, 92 Cal.App.5th at p. 970; see *Yeh*, *supra*, 95 Cal.App.5th at pp. 272–278; *Kielar*, *supra*, 94 Cal.App.5th at pp. 619–621.)

Ford urges that its warranty obligations were contemplated under the language of the sales agreements, rendering them intimately founded in and intertwined with those contracts.  The sales contracts provided: "If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose."  Ford argues: "But Plaintiffs did receive a written warranty — from Ford."  Accordingly, it urges, the contracts contemplated Ford's warranty obligations.  The claim is not persuasive.  The quoted language clearly refers

to any potential written warranties *from the seller*. The sellers made none. The subsequent statement clarifies that the disclaimer has *no effect* on "any warranties covering the vehicle that the vehicle manufacturer *may* provide." (Italics added.) The sales contracts explicitly distinguished between seller's and manufacturer's warranties, defeating Ford's contention that its warranties were intertwined with the contract provisions. Ford suggests the "fact that contracting parties can disclaim implied warranties in sale contracts reinforces the conclusion that such warranties are necessarily terms of the contract." This logic is faulty. As discussed, a seller may disclaim implied warranties under limited circumstances, including when items are sold "as is." (See Civ. Code, § 1792.3.) But that disclaimer does not mean the statutory warranty obligations imposed on others become terms of the sales contract if not disclaimed.

Further, a California Uniform Commercial Code provision comment regarding express warranties has acknowledged that "[a]lthough this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." (Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code, foll. § 2313, com. 2; see *Davis, supra,* 100 Cal.App.5th at p. 838; *Yeh, supra,* 95 Cal.App.5th at p. 275.) This comment recognizes that warranty obligations are not limited to those set out in sales contracts but cautions the California Uniform Commercial Code should not be interpreted to mean that all warranties necessarily become contractual terms. The warranties upon which plaintiffs' claims rest are

independent of the sales contracts, not intimately intertwined with them.

These circumstances differ greatly from the authorities applying estoppel to cases where a nonsignatory demands arbitration. The essential disputes in those cases involved allegations that the defendants themselves were liable for a breach of contract terms. In *Metalclad*, the alleged fraud was that Geologic and its parent company, Ventana, never intended to pay the sales price agreed upon to purchase Esconsa, and Metalclad's lawsuit was an attempt to recoup the purchase price as damages for breaching the sales agreement. (See *Metalclad*, *supra*, 109 Cal.App.4th at pp. 1716–1719.) Likewise in *Turtle Ridge*, the fraud claim ultimately sought to vindicate the plaintiff's subcontractor agreement with Clientlogic, which was terminated when SBC ended its agreement with Clientlogic. (See *Turtle Ridge*, *supra*, 140 Cal.App.4th at pp. 833–835.) In the employment contract cases, although the plaintiffs couched their claims as Labor Code violations, the essential dispute was that the subsequent, assigned employer failed to honor the employment contract, and the code violations stemmed from that failure. (See *Garcia*, *supra*, 11 Cal.App.5th at pp. 786–788; *Boucher*, *supra*, 127 Cal.App.4th at pp. 272–273.) By contrast here, Ford's alleged warranty obligations appear nowhere in the sales contracts. Ford's liability for them, if any, derives from statutory mandates.

Arguing against this conclusion, Ford relies primarily on *Felisilda*. As discussed, that case concluded a car manufacturer could invoke an arbitration clause appearing in a sales contract between a buyer and a dealership under circumstances similar to the present case. As relevant here, *Felisilda* reasoned estoppel should apply because "the sales contract was the source

of the warranties at the heart of this case." (*Felisilda*, *supra*, 53 Cal.App.5th at p. 496.) *Felisilda* mischaracterized the origins of the manufacturer's warranty obligations. It is true that Ford would not owe any obligation to plaintiffs under a manufacturer's warranty unless plaintiffs bought a Ford automobile. (See *Rodriguez v. FCA US LLC* (2024) 17 Cal.5th 189, 739.) However, this but-for cause only explains how plaintiffs acquired ownership. As the cases enforcing estoppel make clear, in determining whether plaintiffs are estopped from suing Ford, the essential concern is whether plaintiffs are trying to enforce contractual terms beneficial to them while avoiding their own contractual agreement to arbitrate. Here, as discussed, plaintiffs' warranty and fraud claims do not seek to enforce any contractual term. Indeed, plaintiffs' claims would be the same even if there were no sales and financing contract. As the Court of Appeal below observed, the sales contracts "include no warranty, nor any assurance regarding the quality of the vehicle sold, nor any promise of repairs or other remedies in the event problems arise." (*Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at p. 1335.) The contracts disclaim any warranty on the part of the contracting dealers and make clear the contracts have "no effect on 'any warranties covering the vehicle that the vehicle manufacturer may provide.' In short, the substantive terms of the sale contracts relate to sale and financing and nothing more." (*Ibid*.) The fact that the sales contracts expressly disclaim any dealer warranties while acknowledging potential manufacturer warranties " 'demonstrates an intent to distinguish and distance the dealership's purchase agreement from any warranty that [the

manufacturer] "may" provide.' " (*Davis*, *supra*, 100 Cal.App.5th at p. 837.)[5]

Ford asserts plaintiffs' claims are necessarily intertwined with the sales contracts because they must presuppose their existence. Thus, plaintiffs must rely on the contracts to pursue their fraud and warranty claims. It is true that some cases have suggested that "a signatory to a[n] agreement containing an arbitration clause may be compelled to arbitrate its claims against a nonsignatory when the relevant causes of action rely on and presume the existence of the contract." (*Boucher*, *supra*, 127 Cal.App.4th at p. 269; see, e.g., *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1241; *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 717.) However, Ford takes the statements from these cases out of context. As noted by *Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, "merely 'mak[ing] reference to' an agreement with an arbitration clause is not enough" to trigger estoppel. (*Id.* at p. 218.) As *Goldman* observed, "unless a party to an arbitration agreement has used the substantive terms of that agreement as the foundation for his claims against a nonsignatory, there is no reason in equity why he should be forced to arbitrate his claims against the nonsignatory." (*Id.* at p. 235.) And, here, plaintiffs' claims are founded on statutory obligations and fraud allegations, not the sales contract.

This case also differs from *Metalclad* and its progeny because the relationships between the contracting parties and the nonsignatory seeking to compel arbitration were much

---

[5] We disapprove *Felisilda v. FCA US LLC*, *supra*, 53 Cal.App.5th 486 to the extent it is inconsistent with our opinion.

closer in those cases. In *Metalclad*, nonsignatory Ventana sought to enforce an arbitration agreement entered into by its subsidiary Geologic. (See *Metalclad*, *supra*, 109 Cal.App.4th at p. 1717.) Similarly, in *Turtle Ridge*, the plaintiff was explicitly authorized as a subcontractor in the agreement between Clientlogic and SBC, which contained the arbitration clause. (See *Turtle Ridge*, *supra*, 140 Cal.App.4th at pp. 833–834.) The plaintiff's relationship with SBC rested solely on the contract between SBC and Clientlogic. In the employment cases, the nonsignatory employers had been assigned the plaintiff employees by another company which had employed them. (See *Garcia*, *supra*, 11 Cal.App.5th at pp. 787–788; *Boucher*, *supra*, 127 Cal.App.4th at pp. 271–273.)

All these complex factual and legal entanglements contrast markedly from the fact patterns here. Although the dealers sold Ford vehicles, there were no allegations that they acted either as agents of Ford or otherwise on their behalf. Had the dealerships acted as Ford's agents when selling the cars, Ford could argue it had a right to invoke the arbitration clause in the sales contracts entered into by its agents. (Cf. *Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 838; *DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352–1353; Civ. Code, § 2295 [defining "agent"].) But plaintiffs' claims allege no such agency relationship. As the court below observed, the fraudulent inducement claims are based on Ford's "statements in a marketing brochure and, in particular cases, the window sticker or [a Ford] press release as well. These allegations make no reference to any other alleged misrepresentations — not by the dealers; not by dealers' salespeople." (*Ford Motor Warranty Cases*, *supra*, 89 Cal.App.5th at p. 1342.) Further, while

plaintiffs alleged Ford knew of the cars' defects, they did not claim the dealers were also aware of them.  (*Ibid*.)  Ultimately, "[t]here are no allegations that the vehicles sold belonged to [Ford], as opposed to the dealer.  There are no allegations that [Ford], rather than the dealer, financed the sales.  There are no allegations that [Ford] controlled or had any direct interest in the transactions.  In short, there are no allegations that the dealers were transacting other than for their own account in entering into the sale contracts." (*Id*. at p. 1343.)  Accordingly, plaintiffs' claims against Ford do not seek to enforce any term of the sales contracts with the dealers.  The dealers acted independently of Ford in entering into those agreements.  Plaintiffs' suits did not make use of a contract provision while attempting to avoid their own obligation in the same contract upon which they rely.

In sum, Ford cannot compel plaintiffs to arbitrate their claims against it.  Properly read, the language of the arbitration clauses agreed to by plaintiffs and the dealers does not support an agreement to arbitrate with third parties.  Further, plaintiffs' claims flow not from the contracts but from separate statutory requirements and conventional fraud theories.  They are not intimately founded in and intertwined with the contractual terms.

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Ford Motor Warranty Cases

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 89 Cal.App.5th 1324
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S279969
**Date Filed:** July 3, 2025

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Amy D. Hogue

_____

**Counsel:**

Shook Hardy & Bacon, Andrew L. Chang, Amir Nassihi and Nalani L. Crisologo for Defendant and Appellant.

Schaerr | Jaffe and Donald M. Falk for the Chamber of Commerce of the United States of America and the Alliance for Automotive Innovation as Amici Curiae on behalf of Defendant and Appellant.

Gupta Wessler, Jennifer Bennett, Jessica Garland, Linnet Davis-Stermitz; Kiesel Law, Paul R. Kiesel; Knight Law Group, Roger Kirnos and Steve Borislav Mikhov for Plaintiffs and Respondents.

Seth E. Mermin, David S. Nahmias and Leila Nasrolahi for the UC Berkeley Center for Consumer Law and Economic Justice, Consumer Federation of California, Consumers for Auto Reliability & Safety, Housing & Economic Rights Advocates, Impact Fund, Katharine & George Alexander Community Law Center, National Association of Consumer Advocates, National Consumer Law Center, Public Counsel,

Public Justice, Towards Justice and UC Berkeley Center for Law & Work as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew L. Chang
Shook Hardy & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
(415) 544-1900

Jennifer D. Bennett
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336